Alan BURCH, et al., Plaintiffs,

v.

Brian N. BARKER, et al., Defendants.

No. C84–35D.

United States District Court,
W.D. Washington.

Jan. 12, 1987.

Frederick L. Noland, MacDonald, Hoague & Bayless, Patricia J. O'Hanley, American Civil Liberties of WA Foundation, Seattle, Wash., Assoc. Counsel: Kenneth H. Davidson, Kirkland, Wash., for plaintiffs.

George W. Akers, Montgomery, Purdue, Blankinship & Austin, Robert P. Piper, Mary Ellen Hanley, Karr, Tuttle, Koch, Campbell, Mawer & Morrow, Seattle, Wash., for defendants.

## MEMORANDUM ORDER

DIMMICK, District Judge.

## I.

## INTRODUCTION

This trial of November 19–20, 1985 dramatized a clash between the First Amendment freedom of expression and necessary government regulation of that expression. In this case, it took the form of a protest by public high school underground student newspaper writers against school district regulations which require predistribution approval of their written expression. The students' challenge raises two questions: (1) Were the existing school district regulations governing free speech (the "old policy") unconstitutional as applied to plaintiffs, and (2) are the current school district regulations governing free speech (the "new policy") facially unconstitutional?

After considering the testimony at trial, oral argument and briefs which interpreted the published decisions on this complex subject, the Court concludes that the new policy is substantially constitutional. The prior restraint [1] requirement is constitutional, since, except for a few minor exceptions, the procedural safeguards and definitions incorporated into the current school district regulations are adequate. The Court further rules that the facial constitutionality of the old policy is a moot issue, since it is no longer in effect. The application of the old policy to the student authors satisfies constitutional requirements.

## II.

## FINDINGS OF FACT

The facts of this case are not substantially in dispute. Plaintiffs are a group of present and former Lindbergh High School students and their parents. Defendants are the Renton School District No. 403, Lindbergh High School Principal Brian H. Barker, School Superintendent Gary F. Kowles and members of the Renton School District Board of Directors. Five of the plaintiffs (hereinafter called the "student authors") distributed an anonymous newspaper, *Bad Astra*, on May 20, 1983, without the knowledge of school authorities.

*Bad Astra* was produced at the expense of the student authors on their own time and off school property. The paper was delivered by the mother of one of the student authors to the school on May 20, 1983. Approximately 350 copies were distributed that day on school grounds during the senior class barbecue, a school sponsored festive event. The mother, who was president of the Lindbergh High School Parent Teacher Association, placed a copy of the paper in faculty and staff mail boxes on that date.

The paper included articles written by the student authors under pen names, as well as poetry by Steven Crane, Edgar Lee Masters, and Langston Hughes. The general tone of the paper was critical of school administration policy and one article contained a biting mock teacher evaluation poll. However, the paper contained no profane language or obscenity.

There was a significant amount of testimony at trial regarding the impact of *Bad Astra* on school order immediately following its distribution. Plaintiff Mark Hogan testified that, immediately following distribution, his teacher noticed students reading *Bad Astra* and instructed them to "put it away," with class continuing as normal.

---

1. "Prior restraint" is defined as a policy which requires approval of student writings before distribution. "Prior restraint" is used herein interchangeably with "prior approval," "prior review," and "predistribution approval."

Student Jennifer Hoban testified that she saw no disruption in class as a result of *Bad Astra* distribution. Principal Barker testified that several faculty and staff members who were criticized in *Bad Astra* found it emotionally difficult to continue with the remaining half day of class in a normal, productive manner.

In the several days after distribution, school authorities identified the student authors. It was not disputed that *Bad Astra* was distributed in violation of School District Regulations No. 5133 (hereinafter called the "old policy", Plaintiffs' Trial Exhibit No. 1, reproduced in Appendix A), which was in effect at that time. Discipline was imposed, primarily in the form of a mild letter of reprimand placed in each of the student authors' school record. The principal stated in writing at the time that discipline was imposed because (1) the student authors signed the articles appearing in *Bad Astra* with pseudonyms rather than their bona fide names as required by the old policy; and (2) a copy of *Bad Astra* was not provided to the building principal prior to distribution, as required by the old policy.

The student authors appealed this disciplinary action to the School Superintendent pursuant to the old policy, and on June 6, 1983, met with him to deliver written and oral argument in support of their contention that the old policy was unconstitutional. On June 10, 1983, the Superintendent issued a letter affirming the disciplinary action of the school principal. The students did not appeal this decision to the School Board as was required by the old policy, although the students were admittedly quite familiar with the provisions of the old policy.

Before, during, and after distribution of *Bad Astra*, the Renton School Board and School Superintendent were engaged in revising the old policy. On June 23, 1983, the School Board met with regard to this issue. The student authors were present and criticized both the old and proposed new policies through the presentation of extensive written and oral arguments. They also proposed a substitute policy, drafted by the Student Press Law Center in Washington, D.C. The School Board subsequently adopted a new policy (hereinafter called the "new policy", Plaintiffs' Trial Exhibit No. 5, reproduced in Appendix B) on August 18, 1983. The facial constitutional validity of the new policy is the major issue in the instant case. The new policy, like the old policy, requires prior approval of student writings before distribution.

Testimony at trial was devoted in part to the "chilling" effect of a prior restraint policy at Lindbergh High School. Plaintiffs assert that both the old and new policies inhibit aspiring student authors in the exercise of the right to communicate ideas and opinions within the district schools. The Court finds that testimony, as well as common sense, indicates that a prior restraint policy would dissuade some students from attempting to publish their writings because of fear that the material would not be approved. Certainly bureaucratic barriers such as a prior restraint policy have at least a slight chilling effect on whatever action they are erected to regulate.

There were also contested issues regarding the effect distribution of written materials on school grounds has on school order and the educational process generally. Mr. William Butler, principal of Rainier Beach High School in the Seattle School District, testified for plaintiffs that based on his experience he has seen no disruption due to distribution of student-written materials within Rainier Beach High School. He testified that his high school does not employ a policy of prior approval and that on the one occasion on which written obscenity was distributed to students during his tenure as principal, he immediately collected the offensive material with little disturbance.

Lindbergh High School Principal Barker, one of the defendants in this case, testified that potential disruption from uncensored distribution of written materials could include distractions to staff and faculty, hurt feelings, career damage to teachers criti-

cized in writing, decreased enrollment in criticized teachers' classes, and potential school liability for damages caused by distribution of uncensored materials. Gerry Kowles, Superintendent of the Renton School District, noted that parental and community expectations are a further reason for a policy of prior restraint. Defendants' expert, John Fodderingham, Associate Executive Director of the Washington Association of School Administrators, testified that a majority of Washington public schools employ a policy of prior restraint and that such a policy is necessary for safe and effective operation of the public high schools, including the development of strong student-faculty relationships and the establishment of a proper dialogue between students and administration.

The President of the Renton School Board testified that a policy of prior restraint is necessary to maintain discipline and that, in her opinion, where tension between students and faculty exists there is disruption. Although agreeing on cross-examination that heated discussion is not necessarily "substantial" disruption, she explained during direct examination that outside criticism and opinions distract students from their classwork.

With regard to the disruption issue, the Court finds as fact that the publication of *Bad Astra* did unsettle the faculty, staff and administration at Lindbergh and did result in the emotional unhappiness of several faculty members. It did not cause violence, physical harm, or generally interfere with the conduct of classes. However, credible evidence established that uncensored student writings have been published in other high schools that did cause, or had the potential for causing, much disruption because they were distributed without prior approval. Expert testimony corroborated the fact that this potential for disturbance from publication of uncensored student writings exists. Therefore, the Court finds as a matter of fact that the potential for disruption of a high school does exist where students distribute written materials on school grounds without prior approval. All of the defendants testified that they

would have allowed *Bad Astra* to be distributed, as written. However, Principal Barker testified that if he had been advised of the contents beforehand, he would have had time to work with the teachers who were offended to ease the adverse effect of *Bad Astra* distribution.

In addition, the Court notes that the student authors wrote a post-distribution letter of apology for "poor taste" comments appearing in *Bad Astra*. Had some of these articles been discussed with the Principal before distribution, the students might have chosen to delete or rewrite them to avoid the pain that they caused. Such student-teacher interaction is part of the learning process, with students taking responsibility for the effect of their conduct.

## III.

### CONCLUSIONS OF LAW

There are two distinct questions of law before the Court.

A. *Constitutionality of the New Policy Regulations 5220, 5220R, and 1130.*

The first question requires a determination of the facial constitutionality of the new policy. In view of the history of interest balancing that has followed the First Amendment, there is no clear-cut answer to this question. The Court finds that as a matter of law the new policy as a whole is substantially constitutional. However, some of the provisions of Regulation 5220R are vague, and should be revised to satisfy constitutional requirements.

1. *The prior restraint requirement.*

■ A strong presumption against any prior restraint of speech dates back to the earliest days of our country, and this presumption exists with respect to children as well as adults. Secondary students do not "shed their constitutional rights to freedom of speech or expression at the school house gate." *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503,

506, 89 S.Ct. 733, 736, 21 L.Ed.2d 731 (1969). However, these rights are not co-extensive with those of adults and may be modified or curtailed by school policies that are reasonably designed to adjust students' rights to the needs of the school environment. *Nicholson v. Board of Education,* 682 F.2d 858, 863 (9th Cir.1982).

■ Thus, a policy of prior restraint in a public high school is not unconstitutional per se. *Eisner v. Stamford Board of Education,* 440 F.2d 803, 805 (2d Cir.1971); *Thomas v. Board of Education,* 607 F.2d 1043, 1049–50 (2d Cir.1979); *Nicholson v. Board of Education,* 682 F.2d 858, 863 (9th Cir.1982); *Shanley v. Northeast Independent School Dist.,* 462 F.2d 960, 969 (5th Cir.1972); *Nitzberg v. Parks,* 525 F.2d 378, 382 (4th Cir.1975); *Quarterman v. Byrd,* 453 F.2d 54, 57–58 (4th Cir.1971); *but see Fujishima v. Board of Education,* 460 F.2d 1355, 1357 (7th Cir.1972).

However, the burden is on defendants to show that a prior approval requirement is justified. Under similar circumstances, the *Tinker* court noted that, in order to justify suppression of speech, there must exist convincing "evidence that the school authorities had reasons to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students." *Tinker,* 393 U.S. at 509, 89 S.Ct. at 737. This standard has been applied by the courts when considering the constitutionality of prior restraint of student speech in public schools.

■ The facts found by this Court support the conclusion that uncensored student writings could create a substantial interference with the operation of the school or impinge upon other students' rights at Lindbergh High School. While the Court does not find that *Bad Astra* created such a disturbance, evidence shows that distribution of written material to students on school grounds could create and has created such an interference. As discussed above, there was testimony and evidence introduced by defendants of the potential for damage caused by unannounced distribution of underground student newspapers containing obscenities, libel, or malicious attacks on students or faculty. Instances of disruption in other school districts were described. Such damage could also occur at Lindbergh. Thus, a prior restraint policy is justified.

Plaintiffs argue that, for example, libel, or obscenity could be prohibited by school authorities without a requirement of prior approval. However, the point of the prior approval policy is to give school authorities the opportunity to identify such libel or obscenity that the students might not recognize in their own writings. A properly instituted prior approval procedure simply protects against the possibility that material which could be prohibited would be unwittingly distributed by student authors. Both parties would agree that while the tendency to inadvertently publish volatile or libelous material is neither limited to teenagers nor present in all teenagers, it is more likely that the average teenager would misjudge the potential harm of distribution of his or her written work within the school than would an adult. The Court realizes that if a student decides to knowingly publish obscenity he or she would probably be equally willing to also violate the prior approval requirement. Nonetheless, while not foolproof, a prior approval requirement provides a procedure by which the school administration can in good faith screen student writings for potentially damaging content.

Plaintiffs also argue in their supplemental memorandum that a regulation which simply required "prior notice" of distribution would address school authorities' concerns and would be less restrictive than the present policy which requires prior approval of written materials. It is true that if the school principal knew what was going to be distributed, he or she could take steps to prepare faculty and staff for distribution. In many cases, prior notice and controlled distribution would be sufficient to avoid what would be the adverse impact of surprise distribution.

Nonetheless, evidence and common sense require a finding that prior notice does not meet the legitimate needs of school officials in all cases as well as a prior approval requirement. Time, place and manner restrictions will not always be sufficient to avert damage caused by written materials that could and should be censored by school authorities if presented to them for approval prior to distribution.

■ However, school authorities who implement a prior approval process have a constitutional obligation to attempt to control potential harm in any reasonable way before prohibiting distribution of written materials on school grounds. The courts have repeatedly noted the danger of allowing school officials to be the predistribution judges of student writings. The Second Circuit has written that a school official's "intimate association with the school itself and his understandable desire to preserve institutional decorum give him a vested interest in suppressing controversy." *Thomas v. Board of Education*, 607 F.2d 1043, 1051 (2d Cir.1979). That court explained that "Under the guise of beneficent concern for the welfare of school children, school authorities, albeit unwittingly, might permit prejudices of the community to prevail." *Id., quoting James v. Board of Education*, 461 F.2d 566, 575 (2d Cir.1972). The *Tinker* court ruled against restraint partially because "it was not fear of disruption that motivated the regulation prohibiting the arm bands; the regulation was directed against 'the principle of the demonstration itself.'" *Tinker*, 393 U.S. at 509 n. 3, 89 S.Ct. at 737 n. 3.

■ In the instant case, there was testimony at trial regarding the community's right to monitor speech in the school. The community does have a right and responsibility to make many decisions regarding public education and school authorities do have the right to reasonably control the time, place, and manner of distribution of student underground newspapers. However, regardless of community sentiment, neither the community nor school authorities have the right to use a policy of prior approval to censor student-written materials except in certain specifically excepted instances when no time, place or manner regulations would avert potential harm. While biology is certainly a worthwhile subject, as the School Board President testified at trial, the fact that a student publication might divert students' attention from biology to arms control or abortion is in no way a constitutionally valid reason for suppressing that student publication, providing that it does not interfere with the conduct of biology class. Although the Court finds the prior approval requirement constitutional in the instant case, school officials should follow this maxim: "When in doubt, do not censor."

### 2. *Specific unconstitutional provisions of 5220 and 5220R.*

Where a prior approval requirement exists, clear criteria and an explicit appellate procedure are essential to protect student expression from unconstitutional censor. Although noting that a policy of prior restraint is not unconstitutional per se, courts in similar contexts have almost invariably struck down policies that included prior restraint because they were vague, lacked the requisite procedural safeguards, or contained inadequate appellate procedures. Although this Court instead chooses to find the new policy substantially acceptable, several provisions are impermissibly vague. These provisions are as follows:

■ (a) The first paragraph under the provision entitled "Distribution of Written Material", Regulation 5220R, prohibits dissemination of unapproved written material on school premises "or in a manner reasonably calculated to arrive on school premises." School officials have no authority to control distribution of student written materials off school premises. *See Shanley v. Northeast Independent School Dist.*, 462 F.2d 960 (5th Cir.1972).

■ (b) Number 7 under the section of Regulation 5220R entitled, "Conditions which may cause verbal or written expression to be restricted or prohibited", allows

prohibition of an expression that "encourages actions which endanger the health and safety of students." This provision is too vague. It is also redundant. Almost any writing that could be constitutionally censored because of its potential harmful effect on health or safety could be prohibited under number 1 of this section which includes under the definition of "substantial disruption" written or verbal expression that would result in "injury or damage to persons or property." The only exception might be expression which would not create a substantial disturbance, although it advocates illegal activity. A provision allowing censorship of expression which clearly advocates illegal activity, not including expression which criticizes existing laws, would be constitutionally permissible.

■ (c) The last paragraph of the section of Regulation 5220R entitled, "Procedural Due Process," provides for appeal of an adverse decision to the School Board of Directors following appeal to the School Superintendent. However, it does not specify the number of days within which the Board of Directors must answer the appeal. We can assume the decisions would be rendered that same evening. However, this omission should be ameliorated. In order to be constitutionally valid, time limits for decision making must exist at every level of the appeal process. *See Eisner v. Stamford Board of Education,* 440 F.2d 803, 810–11 (2d Cir.1971).

(d) Number 1 under the section of Regulation 5220R entitled, "Conditions which may cause verbal or written expression to be restricted or prohibited" states in part that:

> In order for verbal or written expression to be disruptive or hazardous, there must exist clear and specific facts upon which it would be reasonable to judge that a clear and present likelihood of an immediate and substantial disruption would result if the expression were allowed to occur.

The language of Number 1 is consistent with the standard explicated in *Tinker* and its progeny. However, it would benefit

students and school authorities if the section quoted above were elaborated to give guidance by way of examples or descriptions as to what amounts to a substantial disruption of school activities. *See Nitzberg v. Parks,* 525 F.2d 378, 383 (4th Cir. 1975). As noted in *Eisner v. Stamford Board of Education,* 440 F.2d 803, 809 (2d Cir.1971):

> The Board might also undertake to describe the kind of disruptions and distractions, and their degree, that it contemplates would typically justify censorship, as well as other distractions or disorders that it would consider do not justify suppression of students' attempts to distribute literature.

## B. *Constitutionality of the Old Policy, Regulation 5133*

The second question facing the Court concerns the constitutionality of the old policy, Regulation 5133. This involves a three-part inquiry.

■ The first inquiry is whether or not the Court may rule upon the facial constitutionality of the old policy. The Court concludes that it may not. This is a moot question, since the old policy has not been in effect in the Renton School District since August 18, 1983, when the new policy took effect.

■ The second inquiry regards plaintiffs' failure to exhaust state administration remedies. The old policy provided for appeal of the Principal's decision first to the School Superintendent and then to the School Board. Although plaintiffs appealed the Principal's decision to the School Superintendent, they did not appeal that decision to the School Board. The question is thus whether or not plaintiffs' failure to exhaust the administrative remedies provided in Regulation 5133 precludes consideration of the constitutionality of the old policy as applied to the student authors.

The Court has determined that it does not. The appeal process provided by Regulation 5133 exists to provide for review of a school principal's disciplinary action taken

pursuant to the policy. Since neither the propriety of the particular form of discipline meted out by the Principal nor the correctness of the Principal's interpretation of the language of the old policy is at issue, failure to exhaust administrative remedies does not preclude consideration of the constitutional question posed to the Court. In other words, plaintiffs do not deny that the student authors violated Regulation 5133, or that the disciplinary action taken by the Principal was appropriate if the old policy was applied to the student authors in a constitutional manner. The issue is instead whether Regulation 5133 is constitutional, as it was applied to the student authors. The policy reasons for deferring to administrative expertise are thus inapplicable. School Board administrative remedies need not be exhausted before this issue may be considered.

■ The final, substantive part of the inquiry is thus whether or not Regulation 5133 is constitutional as it was applied to the student plaintiffs. This question is a very narrow one which requires consideration only of the facts of the instant case. The students were disciplined because they did not submit *Bad Astra* to the School Board for prior approval, and did not sign the articles appearing in *Bad Astra*. If the students had submitted *Bad Astra* to the Principal, had been denied approval, but had nonetheless proceeded to distribute the paper, the Court would be faced with the task of determining whether or not the criteria and procedures of the old policy under which the decision was made satisfy constitutional requirements. However, the student authors were not disciplined because of the content of *Bad Astra*.

Thus, because the content of *Bad Astra* was never assessed pursuant to the old policy, the Court is faced only with the question of the constitutionality of application of the prior approval and signature requirements of the old policy. It was noted earlier that a prior approval requirement is constitutional if accompanied by appropriate procedural safeguards, including adequate criteria, definitions, and provision for appeal. Thus, the student authors' violation of the prior approval requirement is a constitutionally sound reason for discipline under the policy in the instant case; since the content of *Bad Astra* had nothing to do with application of the policy and the resulting disciplinary action, the question of the constitutionality of all other provisions of the old policy relating to content assessment is inapplicable and unanswerable.

Furthermore, plaintiffs conceded at trial that a requirement that students include bona fide signatures on student publications is sound. Thus, the second basis for discipline under the old policy also satisfies constitutional requirements.

Therefore, the Court holds that Regulation 5133 was applied in a constitutional manner to the student authors, and thus will not disturb the disciplinary action taken by the Principal. Notwithstanding the Court's ruling on this issue, defendants may wish to consider voluntarily removing the disciplinary letters from the student authors' files in light of the student authors' considerable efforts to assist the School Board with the development of the new policy.

THEREFORE, the Court (1) declares, pursuant to 28 U.S.C. § 2201, that the new policy is constitutional, conditioned upon revisions described herein, and (2) concludes that the old policy was applied to the student author plaintiffs in a constitutional manner.

## APPENDIX A

### FREEDOM OF SPEECH, ASSEMBLY AND PUBLICATION

#### Speech

Students are entitled to orally express their opinions. Such oral opinions shall not interfere with the freedom of others to express themselves. The use of obscenities or personal attacks is prohibited.

#### Assembly

All student meetings in school buildings or on school grounds may function only as a part of the formal educational process or as authorized by the principal.

Students have the freedom to assemble peacefully. There is an appropriate time and place for expression of opinions and beliefs. Conducting demonstrations which interfere with the operation of the school or classroom is inappropriate and prohibited.

### Publication

All requests by students for the distribution of materials must be submitted to the appropriate building principal prior to the distribution of said materials on school property: Such requests must be accompanied by a copy of the material(s) students are seeking to distribute. The principal will ordinarily authorize the distribution provided:

1. The material is written by students currently enrolled in the Renton School District.
2. The authors are identified in a conspicuous location on all materials.
3. The material is free from libel, slander, obscurity, personal attacks or incitement to illegal action(s).
4. The material is free from unauthorized solicitation.
5. The material is distributed as directed by the principal in such a manner as not to interfere with or disrupt the normal educational process.

Students in violation of these regulations shall be subject to appropriate disciplinary action.

Any disciplinary action taken by the District under this policy shall not abridge any individual's rights to due process under the law.

Renton School District No. 403
Renton, Washington

POLICY
Adopted: Jan. 20, 1977

### APPENDIX B

### FREEDOM OF EXPRESSION—REGULATIONS

#### Authority

The school principal or designee shall have the authority to monitor the distribution of materials as well as other forms of student verbal and written expression. He/she will give due consideration to the constitutionally protected right of freedom of expression, the maintenance of the normal operation of the school and its activities, the protection of persons and property, and the need to assist students in learning appropriate ways to exercise their rights.

### Distribution of Written Material

Distribution of material means dissemination of ten or more copies of written material on school premises, or in a manner reasonably calculated to arrive on school premises.

Students wishing to distribute material must request permission in advance from the principal or designee. Such requests must be accompanied by a copy of the material(s) students wish to distribute. Authorization will generally be granted provided:

1. the material is written by students currently enrolled in the Renton School District or meets the requirements of RSD Policy 1130, Distribution of Materials Through Students;
2. the material is free from advertisements of cigarettes, liquor, illegal or illicit drugs, or drug paraphernalia;
3. the material is distributed as directed by the principal or designee in such a manner as not to materially or substantially interfere with or disrupt the normal operation of the school; and
4. the material is free from the conditions cited below.

### Conditions Which May Cause Verbal or Written Expression to be Restricted or Prohibited

Under the following conditions written material as described above and other forms of written and verbal expression may be restricted or prohibited when expression is inappropriate to the maturity level of the students and:

1. When there is evidence which reasonably supports a judgment that significant or substantial disruption of the normal operation of the school or injury or damage to persons or property may result.

   In order for verbal or written expression to be disruptive or hazardous, there must exist clear and specific facts upon which it would be reasonable to judge that a clear and present likelihood of an immediate and substantial disruption would result if the expression were allowed to occur. (See RSD Policy 5400, Student Conduct.)

2. When the expression is construed to be obscene.

   Obscene expressions are those which the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to prurient interests; that the work depicts or describes in a patently offensive way sexual conduct specifically defined by the applicable state law; or the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

3. When the expression is considered libelous.

   The expression shall be considered libelous when it includes defamatory falsehoods about individuals. In order to be libelous, the defamatory falsehood must be made with actual malice; that is, with the knowledge that it is false or with reckless disregard of whether it is false or not.

4. When the expression invades the privacy of other individuals.

   Invasion of privacy includes exploitation of an individual's personality, providing information of an individual's private affairs with which the public has no legitimate concern, or wrongful intrusion into an individual's private activities in a manner that can cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.

5. When the expression criticizes school officials or advocates violation of school rules to the extent that there is evidence that supports a judgment that substantial disruption of the normal operation of the school will result (see 1.).

6. When the expression attacks ethnic, religious, social, or handicapped groups; or females or males as a group; or promotes discrimination against said groups and there is substantial evidence indicating such expression will result in substantial disruption of normal school operation.

7. When the expression encourages actions which endanger the health and safety of students.

*Procedural Due Process*

The principal has two (2) school days to determine whether authorization to distribute the material will be granted. If the principal decides to withhold authorization, the principal must state the reasons in writing and provide the student(s) with a copy of the reasons.

The aggrieved student(s) may within five (5) school days appeal in writing the decision to the Superintendent who must issue a written decision with five (5) school days after receiving the appeal.

If the student(s) request a personal hearing with the Superintendent to present their views, the hearing must be held within five (5) school days of the request, and a written decision must follow the hearing within five school days.

If the concern is not resolved to the satisfaction of the student(s) at the Superintendent level, the student(s) may appeal to the Board of Directors, who will hear the concerned at the next regularly scheduled meeting provided the appeal has been received at least two (2) days prior to the meeting.

*Violation of Policy and/or Regulations*

Students who violate these regulations and/or the accompanying policy are subject

**1160**

to appropriate disciplinary action which may include discipline, short or long-term suspension, or even expulsion, all as defined in WAC Chapter 180–40, depending on the severity of the violation and the student(s) record.

> Renton School District No. 403
> Renton, Washington

REGULATIONS APPROVED: August 18, 1983

*FREEDOM OF EXPRESSION*

Freedom of expression is an important component of a democratic society. Such freedom is to be encouraged as part of the educational program of the District as long as it does not infringe on the rights of others or substantially disrupt the normal operation of the school or its activities, or present a hazard to persons or property. Freedom of expression carries with it the responsibility to act within the regulations governing this policy and other applicable District policies and state laws.

Students in violation of this policy and its regulations shall be subject to appropriate disciplinary action which may include discipline, short or long-term suspension, or even expulsion, all as defined in WAC Chapter 180–40, depending on the severity of the violation and the student(s) record.

The Office of the Superintendent is granted the authority to develop regulations and administrative procedures as needed to guide the implementation of this policy. Such regulations and procedures shall be consistent with:

1. federal and state law and administrative regulations;
2. District policies; and
3. sound educational practice.
> Renton School District No. 403
> Renton, Washington

POLICY ADOPTED: January 20, 1977
REVISED: August 18, 1983

DISTRIBUTION OF MATERIALS THROUGH STUDENTS

The use of pupils to distribute materials shall be allowed, PROVIDED:

1. the information is generated by non-sectarian groups; and
2. approval of the distribution of materials is supported in accordance with Policy 5520 and regulations 5520 R.
> Renton School District No. 403
> Renton, Washington

POLICY ADOPTED: February 17, 1977
REVISED: August 18, 1983