**Alan BURCH, et al.,**
**Plaintiffs–Appellants,**

v.

**Brian H. BARKER, et al.,**
**Defendants–Appellees.**

No. 87–3612.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 9, 1987.

Decided Nov. 18, 1988.

Kenneth H. Davidson, Kirkland, Wash., for plaintiffs-appellants.

Philip A. Talmadge, Seattle, Wash., for defendants-appellees.

Before GOODWIN, WRIGHT and SCHROEDER, Circuit Judges.

SCHROEDER, Circuit Judge:

## I. OVERVIEW

In 1977, the Renton School District in Renton, Washington, adopted a policy requiring its high school students to submit to school officials for approval all student-written material before any such material could be distributed on school premises or at official school functions. The policy was

directed at student writings that were not contained in official school publications.

On May 20, 1983, students at Lindbergh High School distributed copies of an unauthorized student-written newspaper called *Bad Astra* at a school-sponsored senior class barbecue on school grounds without submitting the material for predistribution review. In addition, a parent, the president of the Lindbergh High P.T.A., placed copies of the newspaper in faculty and staff mailboxes. The school principal reprimanded the students for violating the review policy, but did not find any particular passage or article objectionable.

The parents and the students filed this action in district court pursuant to 42 U.S.C. § 1983 claiming that the predistribution review policy violated their right to freedom of speech guaranteed by the first and fourteenth amendments. The district court held that, with procedural safeguards not relevant to this appeal, the policy of prior review of student-written materials did not invade the students' first amendment rights. 651 F.Supp. 1149. The plaintiffs appeal to this court claiming that they are entitled to expungement from their records of their reprimands, and to declaratory and injunctive relief barring enforcement of policies requiring predistribution review of all non-school-sponsored student writing. The issue before us is thus whether the district court correctly held that the first amendment permitted the school to require prior review, for possible censorship of objectionable content, of all student-written, non-school-sponsored materials distributed on school grounds.

We review the district court's decision in light of the recent Supreme Court decision in *Hazelwood Sch. Dist. v. Kuhlmeier,* — U.S. —, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (*"Kuhlmeier"*). In *Kuhlmeier,* the Supreme Court reaffirmed the principles laid down in *Tinker v. Des Moines Ind. Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), that the first amendment protects the right of high school students to communicate with each other, and further, that school officials may interfere with such communication

only in narrowly defined circumstances. The Court in *Kuhlmeier* held that a policy of prior review and possible censorship of student writing is justified when it is a part of educators' reasonable exercise of authority over school-sponsored publications. The Court drew a clear distinction between whether "the First Amendment requires a school to tolerate particular student speech," the issue addressed in *Tinker,* and "whether the First Amendment requires a school affirmatively to promote particular student speech," the issue addressed in *Kuhlmeier. Kuhlmeier,* 108 S.Ct. at 569. This case, unlike *Kuhlmeier,* concerns a policy aimed at curtailing communications among students, communications which no one could associate with school sponsorship or endorsement. We therefore hold this policy does violate the first amendment.

## II. BACKGROUND

In 1983, five students at Lindbergh High School in Renton, Washington, wrote a four-page newspaper entitled *Bad Astra.* They did so at their own expense, off school property, and without the knowledge of school authorities. The content of *Bad Astra* included articles written by the five students and which were generally critical of school administration policies concerning student activities, student service card requirements and enforcement of student attendance. The newspaper also included a mock teacher evaluation poll, and poetry written by Stephen Crane, Edgar Lee Masters and Langston Hughes. The paper did not include any profanity, religious epithets or any material which could be considered obscene, defamatory or commercial. Students distributed approximately 350 copies of *Bad Astra* at a senior class barbecue; the president of the Lindbergh High School Parent Teacher Association, mother of one of the students, placed copies in school faculty and staff mailboxes.

The school principal censured the students for not submitting *Bad Astra* for predistribution review pursuant to existing school board policy. The principal placed

letters of reprimand in the students' files, where they remain.

The five students, joined by their parents as guardians, commenced this action under 42 U.S.C. §§ 1983, 1985 and 1988. They sought injunctive and declaratory relief holding the predistribution review policy unconstitutional under the first and fourteenth amendments, and asked that the students' reprimands be expunged from their records. The defendants included Brian Barker, Principal of Lindbergh High School, Gary Kohlwes, the school superintendent, and members of the school board of Renton School District No. 403.

The policy in effect when the students were reprimanded ("old policy") was adopted by the Renton School District in 1977 and required prior approval by school officials of any material written by students enrolled in the school and which students wished to distribute on school premises. The material had to be free from "libel, slander, obscurity (sic), personal attacks or incitement to illegal action(s)," and free from "unauthorized solicitation." In addition, student authors were required to be identified on all materials. The school principal was authorized to direct the manner of distribution so as not to "interfere with or disrupt the normal educational process."

After the students' unauthorized distribution of *Bad Astra*, but prior to this lawsuit, the school board decided to revise its predistribution review policy. The "new policy", which included an administrative review procedure, stated that prior approval was necessary for distribution of ten or more copies of written material. While the policy stated that distribution of materials would usually be allowed, the material in order to be approved had to be written by students currently enrolled in the school district, be free from advertisements for cigarettes, liquor, drugs or drug paraphernalia, and be distributed in a manner that would not materially and substantially interfere with the normal operation of the school.

In addition, under the new policy, principals were authorized to ban distribution if the expression was "inappropriate to the maturity level of the students" or was obscene, libelous, or invaded the privacy of others. Principals could also ban materials when there was evidence "which [would reasonably support] a judgment that significant or substantial disruption of the normal operation of the school" could result. The policy provided that such evidence could include expression criticizing school officials or advocating violation of school rules, or expression attacking or promoting discrimination against ethnic, religious, social or handicapped groups or females and males as a group.

For purposes of this appeal, the parties agree the plaintiffs would have been reprimanded under either policy, and that the "new policy" has effectively superseded the old. We refer to them collectively as "the board policy." Under both versions, all student-written communications had to be submitted for prior approval before being distributed on school property; under both versions, students would be formally censured for failure to make such submission, and under neither version was this material objectionable. Also, under neither version did the school attempt to narrow or define the subject matter it wished to scrutinize in order to avoid subjecting all communication to possible censorship.

The case came before the district court for trial on plaintiffs' application for a permanent injunction enjoining enforcement of the policy. There was no evidence that *Bad Astra* had interfered with the operation of the high school or impinged upon other students' rights. It was distributed at a school barbecue at which a rock band was playing and at which the students were already socializing. Defendants showed that a few teachers who had been mocked in the newspaper became emotionally upset, but the distribution caused no violence or physical damage, nor did it interfere with classes. Defendants admitted that if the students had submitted *Bad Astra* for prior review, the defendants would have allowed distribution without change. We thus are confronted with a unique and ironic situation in which a

school has punished students for distribution of material which both sides acknowledge could not be suppressed under the first amendment.

In support of its policy, the defendants offered evidence that a prior publication in a different school in the Renton School District had once harmed a student cheerleader because it contained a story concerning her alleged promiscuity. In addition, they offered evidence that other publications in another school district had caused some disruption of classes. However, only one other "underground" student publication had ever been distributed at Lindbergh High and that paper had created no disturbance.

The defendants' expert admitted that he knew of no studies nor any statistics showing that school districts without a system of predistribution review and censorship of student-written communication experience educational disruption as a result of underground newspapers. He also acknowledged that the Seattle School District, the largest in the state, does not have any requirement of prior approval. There was evidence that the distribution of student-written materials in the Seattle School District has caused no problems.

The defendants themselves testified that in their view a predistribution censorship policy was necessary for the safe operation of the school, to avoid distractions, hurt feelings and career damage to the faculty, to further parental and community expectations and to avoid potential school liability. There was, however, no evidence that anyone familiar with *Bad Astra* confused it with any school-sponsored publication or

believed its contents reflected the view of the school administration.

Although the district court found that the distribution of *Bad Astra* did not disturb school discipline or harm others, it found that "uncensored student writings have been published in other high schools that did cause, or had the potential for causing, much disruption because they were distributed without prior approval." Based on its finding that student-written materials could possibly cause disruption at some time, in some school, it held that the requirement of prior school approval in this case did not offend the first amendment.[1] The court relied upon the Second Circuit's 1971 decision upholding a school policy requiring prior approval of all student-written material distributed on school premises. *Eisner v. Stamford Bd. of Educ.*, 440 F.2d 803 (2d Cir.1971). The district court acknowledged that its decision conflicted with the decision of the Seventh Circuit in *Fujishima v. Bd. of Educ.*, 460 F.2d 1355 (7th Cir.1972). The district court decided this case before the Supreme Court's decision in *Hazelwood Sch. Dist. v. Kuhlmeier,* —— U.S. ——, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

### III. DISCUSSION

The relevant history of the first amendment in American high schools began with the Vietnam War and the Supreme Court's decision in *Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In 1965, a group of Iowa students decided to publicize their objections to the hostilities in Vietnam by wearing black armbands to school. The principals of Des Moines schools became

---

1. While the district court found that the policy was "substantially constitutional," the court in rulings not pertinent to this appeal found portions of the "new policy" unconstitutional because of vague terms or inadequate administrative review. First, the court held that review of material "reasonably calculated to arrive on school premises" was unconstitutional because school officials have no authority outside the school premises. In addition, the court held that a prohibition of material that "encourages actions which endanger the health and safety of students" was unconstitutionally vague. Final-

ly, the court held that the procedural due process was insufficient because it did not specify the number of days within which the school board had to answer the appeal.

The school district did not appeal these rulings. Rather, it revised its predistribution policy to include the district court's suggested modifications ("revised policy"). The "revised policy" is not formally before this court, but it contains the same ban on distribution of non-approved writings which plaintiffs challenge in this appeal, and provides for censorship under essentially the same standards.

aware of the plan and, two days before the day the students planned to begin wearing the armbands, met and adopted a policy that any student wearing an armband to school would be suspended. Tinker and two other students wore their armbands to school, and were suspended. The students sued the school in district court under 42 U.S.C. § 1983 for an injunction, contending that the school district was violating their first amendment rights by punishing protected political expression. *Id.* at 504, 89 S.Ct. at 735.

The Supreme Court recognized the comprehensive authority of school officials over the educational environment but held, in now famous language, that the first amendment protects students' freedom of expression. The Court said that it could "hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. at 735. Thus, *Tinker* held that school officials may punish students for the content of their expression only in limited circumstances. In order to justify prohibiting any particular expression of opinion, they must show more than resultant discomfort or unpleasantness, but that the forbidden conduct would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school." *Id.* at 509, 89 S.Ct. at 738 (quoting *Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir.1966)).

*Tinker* swept broadly in its protection of students' first amendment rights while its description of exceptional situations justifying interference was narrow. *Tinker* cautioned that before deciding that school interference is warranted courts should look to concrete evidence of disturbance or disruption resulting or potentially resulting from specific expression.

Illustrating its fact-specific test, the Court in *Tinker* cited two earlier Fifth Circuit cases, each involving students wearing and distributing "freedom buttons" depicting clasped black and white hands, each involving school prohibitions against students wearing such buttons, and each

reaching the diametrically opposite result from the other. *Compare Burnside v. Byars*, 363 F.2d 744 (5th Cir.1966), cited in *Tinker*, 393 U.S. at 505, 89 S.Ct. at 735, *with Blackwell v. Issaquena County Bd. of Educ.*, 363 F.2d 749 (5th Cir.1966), cited in *Tinker*, 393 U.S. at 505 n. 1, 89 S.Ct. at 735 n. 1. The court in *Burnside* held that the regulation infringed upon the students' right of free expression because there was no evidence that the buttons had created a disturbance. The court in *Blackwell*, however, upheld the rule because the record showed that the buttons had caused disruption of classes and a breakdown of discipline, and that students were being forced to wear the buttons against their will. *Tinker*, 393 U.S. at 505 n. 1, 89 S.Ct. at 735 n. 1. In examining the record before the Court in *Tinker*, the Court noted that

> the record [did] not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred.

*Id.* at 514, 89 S.Ct. at 740.

The Supreme Court in *Tinker* characterized the students' plan to wear armbands as "closely akin to 'pure speech' which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment." *Id.* at 505–06, 89 S.Ct. at 736. The Court found that the school officials banned the armbands not because of any reasonable fear of disruption, but based on an "undifferentiated fear" that the armbands might cause a disturbance. Thus, the Court held school officials could not justify the suppression of the students' expression.

> [U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we

must take this risk ... and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of those Americans who grow up and live in this relatively permissive, often disputatious, society.

*Id.* at 508–09, 89 S.Ct. at 737–38.

The record in this case shows that this policy, with its censure of students for failing to present unobjectionable material for review, is the product of just such an "undifferentiated fear" of disruption. Indeed, this policy appears to be based upon far less justification than the action of the school principals in *Tinker,* which was directed at specific expression in an atmosphere of political turmoil. The school's action in this case is contrary to the principles laid down in *Tinker.*

A decision upholding the school's actions in this case would also be contrary to circuit decisions after *Tinker* involving situations in which student expression came into conflict with school discipline. The courts of appeals after *Tinker* were sensitive to the need to examine whether interference with student expression was justified in a given case, and sensitive to the competing interests of the school in maintaining discipline and of the students in expressing their views.

The Sixth Circuit in *Guzick v. Drebus,* 431 F.2d 594 (6th Cir.1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 941, 28 L.Ed.2d 231 (1971), was confronted with a claim of a student who had been suspended from school for refusing to remove an anti-war button. He claimed that the suspension violated his first amendment rights. The court upheld the suspension only after examining the prevalent atmosphere at the school, which it termed "incendiary," and noting that the enforcement was part of a school policy prohibiting the wearing of any buttons, a policy instituted because of demonstrated racial tensions within the school. *Id.* at 598–600.

Complementing the Sixth Circuit decision in *Guzick* was the Seventh Circuit's decision in *Scoville v. Bd. of Educ. of Joliet High Sch. Dist.,* 425 F.2d 10 (7th Cir.1970). It held that expulsion of students for distributing a non-school-sponsored newspaper critical of the school violated the students' first amendment rights in the absence of any showing by the Board "that the action was taken upon a reasonable forecast of a substantial disruption of a school activity." We find no support in these decisions, following *Tinker's* analysis for a policy which bars all student communications on school premises which have not received prior approval.

Of course these cases, like *Tinker,* did not deal with a general policy of prepublication or predistribution review of student expression. In the wake of anti-Vietnam protests, however, many schools did adopt censorship policies similar to those involved in this case. While this circuit did not have the opportunity to scrutinize such policies, several circuits other than our own struggled, with varying results, to determine to what extent, if at all, such policies could be justified under the first amendment. *See Nitzberg v. Parks,* 525 F.2d 378 (4th Cir. 1975); *Riseman v. School Committee of Quincy,* 439 F.2d 148 (1st Cir.1971); *Eisner v. Stamford Bd. of Educ.,* 440 F.2d 803 (2d Cir.1971); *Quarterman v. Byrd,* 453 F.2d 54 (4th Cir.1971); *Shanley v. Northeast Ind. Sch. Dist.,* 462 F.2d 960, 964 (5th Cir.1972); *Fujishima v. Bd. of Educ.,* 460 F.2d 1355 (7th Cir.1972); *Baughman v. Freienmuth,* 478 F.2d 1345 (4th Cir.1973).

The problem recognized in nearly all of these censorship cases is that a regulation of expression aimed at suppressing speech before it is uttered, as opposed to punishment of individuals after the expression has occurred, is a prior restraint, which generally comes before a court bearing a "heavy presumption" of unconstitutionality. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). One commentator has explained in the following terms the reason for dealing more harshly under the first amendment with regulation through prior restraint than regulation through subsequent punishment:

A system of prior restraint is in many ways more inhibiting than a system of subsequent punishment: It is likely to bring under government scrutiny a far wider range of expression; it shuts off communication before it takes place; suppression by a stroke of the pen is more likely to be applied than suppression through a criminal process; the procedures do not require attention to the safeguards of the criminal process; the system allows less opportunity for public appraisal and criticism; the dynamics of the system drive toward excesses, as the history of all censorship shows.

Emerson, *The System of Freedom of Expression* 506 (1970), *quoted in* Lockhart, Kamisar, Choper and Shiffrin, *Constitutional Law* (6th ed. 1986).

The presumption against prior restraints has been enshrined in our law for more than 50 years. *See Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Prior restraints are permissible in only the rarest of circumstances, such as imminent threat to national security. *Id.* at 716, 51 S.Ct. at 631. *See also New York Times Co. v. United States,* 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971); *Bullfrog Films, Inc. v. Wick,* 847 F.2d 502, 512 (9th Cir.1988) (foreign relations implications insufficient to support content-based restriction on films exported from U.S.). The Supreme Court 50 years ago struck down as invalid on its face an ordinance prohibiting the distribution of literature in a city without written permission of the city manager. *Lovell v. Griffin,* 303 U.S. 444, 451, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938).

In dealing with high school censorship policies after *Tinker,* the courts of appeals recognized that a state policy subjecting all written communications to prior review for possible censorship would be invalid outside the school context. *See, e.g., Eisner v. Stamford Bd. of Educ.,* 440 F.2d at 806. Two key questions remained: whether the first amendment permitted prior restraints in the school context which would be impermissible outside, and if so, when.

The majority of the courts of appeals considering policies similar to the one at issue here found them violative of the first amendment because they were overly broad and inadequately focused on avoidance of disruption and interference with school discipline. *See Riseman,* 439 F.2d at 149–50; *Shanley,* 462 F.2d at 975; *Fujishima,* 460 F.2d at 1359; *Baughman,* 478 F.2d at 1350–51; *Nitzberg,* 525 F.2d at 383. *But see Eisner,* 440 F.2d at 808–09; *Bystrom v. Fridley High Sch. Ind. Sch. Dist. 14,* 822 F.2d 747, 755 (8th Cir.1987). While most of these opinions refrained from holding that any policy of prior review was *per se* a violation of the first amendment, they found constitutionally objectionable policies of blanket review designed to censor out objectionable materials that could be described in only general terms.

For example, the First Circuit in *Riseman* granted a preliminary injunction prohibiting a policy which banned "advertising or promoting the interests of any community or non-school agency or organization without the approval of the School Committee." *Riseman,* 439 F.2d at 148 n. 1. The court drew a distinction between punishment of student conduct which materially disrupts or invades the rights of others under *Tinker,* and the general review policy in question. *Id.* at 149. It held that the review policy was vague and overbroad, and did not reflect any effort to minimize the adverse effect of the prior restraint involved. *Id.* at 149–50.

The Fourth Circuit's decision in *Baughman* also struck down as overly broad a high school policy requiring prior approval of all materials and censorship of those which, in the view of the school administrator, were "obscene" or "libelous." *Baughman,* 478 F.2d at 1350–51. The court found that these terms of art were not sufficiently precise to be understandable by high school students. *Id.* at 1350. The court expressly based its decision on the fact that the policy constituted a prior restraint, and acknowledged that similar standards could have been utilized to impose post-publication sanctions.

If there were no contemplated prior restraint but instead merely post-publica-

tion sanction, the problem of vagueness would not be intolerable.... [w]e think that a regulation imposing prior restraint must be much more precise than a regulation imposing post-publication sanctions.

*Id.* at 1349. Both *Riseman* and *Baughman* suggested that more narrowly drawn regulations might pass constitutional muster, but gave little indication as to what acceptable guidelines might be.

The Fifth Circuit in *Shanley* was a bit more explicit, holding that while a policy requiring that materials be submitted is not unconstitutional "per se," a valid regulation would have to "include guidelines stating the relationship between the prevention or curtailment of 'distribution' and the prevention of material and substantial disruption of school activities that the 'policy' seeks to remedy." *Shanley*, 462 F.2d at 977. Its decision, even more clearly than *Riseman* and *Baughman*, suggests that a valid policy of prior review would have to be limited to review of certain specifically designated types of content. A general requirement for review of all materials, like the one involved in this case, does not satisfy the standards laid down in *Shanley*, *Riseman*, and *Baughman*.

In an effort to find a policy formulation that might survive scrutiny after *Tinker*, the school officials in *Nitzberg* looked to the language of *Tinker* itself. They adopted a policy providing that all material was to be submitted for prior review, but censorship could occur only when the literature reasonably led the principal to "forecast substantial disruption of or material interference with school activities." *Nitzberg*, 525 F.2d at 381. This policy standard is remarkably similar to a portion of the policy involved in this case, which states that material may be censored

[w]hen there is evidence which reasonably supports a judgment that significant or substantial disruption of the normal operation of the school or injury or damage to persons or property may result.

The Fourth Circuit, in an opinion by former Justice Tom Clark, rejected that approach, pointing out that the *Tinker* standard was designed to apply when the precise acts giving rise to the potential disturbance were known. In *Nitzberg* the court held that such language was not an appropriate standard for guiding administrators and students so that they could determine in advance what might or might not be prohibited. *Id.* at 383. The court quoted the opinion of a respected judge:

It does not at all follow that the phrasing of a constitutional standard by which to decide whether a regulation infringes upon rights protected by the first amendment is sufficiently specific in a regulation to convey notice to students or people in general of what is prohibited.

*Id.* (quoting Judge Fairchild's opinion in *Jacobs v. Bd. of Sch. Comm'rs*, 490 F.2d 601, 605 (7th Cir.1973), *vacated as moot*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975)).

Perhaps because it found formulation of an acceptable regulation impossible, the Seventh Circuit in *Fujishima* held that no system of prior review contemplating content-based censorship could validly be imposed under the first amendment. *Fujishima*, 460 F.2d at 1358. It said

In proper context, Mr. Justice Fortas' use of the word "forecast" in *Tinker* means a prediction by school officials that existing conduct, such as the wearing of arm bands—if allowed to continue —will probably interfere with school discipline. *Tinker* in no way suggests that students may be required to announce their intentions of engaging in certain conduct beforehand so school authorities may decide whether to prohibit the conduct.

*Id.* (citation omitted).

In the years immediately following *Tinker*, the only circuit to approve a regulation allowing broad review and censorship of non-school-sponsored publications was the Second Circuit in *Eisner v. Stamford Bd. of Educ.*, 440 F.2d 803 (2d Cir.1971). In *Eisner*, high school students created a newspaper outside the school and wished to distribute it on school grounds. The school board's policy stated that "[n]o material shall be distributed which, either by its

content or by the manner of distribution itself, will interfere with the proper and orderly operation and discipline of the school, will cause violence or disorder, or will constitute an invasion of the rights of others." *Id.* at 805. After acknowledging the presumption against prior restraints, the Second Circuit held that the school board's comprehensive authority over the schools gave it the power to "minimize or eliminate influences that would dilute or disrupt the effectiveness of the educational process as the state conceives it." *Id.* at 807. In effect, Judge Kaufman's opinion in *Eisner* held that high school environments are all "exceptional cases" justifying prior restraints within the philosophy underlying *Near v. Minnesota* [283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931)]. *See id.* at 806–07. The *Eisner* analysis, upon which the district court relied in this case, is in basic conflict with the decisions of the other circuits confronting the prior restraint issue and, we believe, in fundamental conflict with the Supreme Court's analysis in *Tinker.* Its reasoning also conflicts with the Supreme Court's subsequent analysis in *Kuhlmeier.*

All of these decisions in the post-Vietnam era involving prior restraints dealt with non-school-sponsored, or what were commonly referred to as "underground" publications, like the *Bad Astra* with which we are concerned here. These decisions, however, did not focus upon any distinction between school-sponsored as opposed to non-school-sponsored expression.

The Supreme Court did focus on that distinction, however, beginning with its decision in *Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) ("*Pico* "), and continuing in its subsequent decisions in *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986) and *Hazelwood Sch. Dist. v. Kuhlmeier,* —— U.S. ——, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). These cases reinforce and indeed compel the conclusion we reach today that a policy which subjects all non-school-sponsored communications to predistribution review for content censorship violates the first amendment.

In *Pico,* the Supreme Court grappled with a school board's decision to remove certain books from the school library because of content objectionable to the board. The school board in *Pico* had ordered certain books, which it characterized as anti-American, anti-Semitic and "just plain filthy," removed from high school and junior high school libraries. *Pico,* 457 U.S. at 857, 102 S.Ct. at 2803. Justice Brennan's plurality opinion, focusing on the library as the embodiment of the marketplace of ideas, took the view that the school board could not deny students access through the library to ideas with which the school board disagreed. *Id.* at 870–71, 102 S.Ct. at 2809–10. The plurality stated that the "special characteristics of the school *library* make that environment especially appropriate for the recognition of the First Amendment rights of students." *Id.* at 868, 102 S.Ct. at 2809. Thus, the plurality viewed the library less as a part of the school curriculum than as an opportunity for students' self-education.

Chief Justice Burger's dissent, on the other hand, viewed the library as part of the school's curricular environment and the selection of library materials as part and parcel of the school officials' obligation to establish the school curriculum. *Id.* at 889, 102 S.Ct. at 2819. Thus the difference between the plurality opinion and Chief Justice Burger's dissenting opinion in *Pico* was the dissent's greater deference to the discretion of school officials to determine what materials the school itself was going to make available to students.

Implicit in both these opinions in *Pico* is the premise that control over the educational curriculum requires control by administrators over the content of what is taught; this is a premise made more explicit in *Kuhlmeier.* The corollary of this premise is that no similar content control is justified for communication among students which is not part of the educational program. The Court in *Pico,* however, addressed no unified voice to the question of how far educators' authority to control the curriculum reaches into the educational environ-

ment. The Supreme Court clarified this issue to some extent in *Fraser*.

In *Fraser*, the Court dealt with school punishment of a student's use of sexual vulgarity in a school assembly campaign speech. The power of schools to impose standards not merely on the formal curriculum, but upon student conduct in school-sponsored forums, was the theme of the Court's decision. It held that the school could punish a student for giving a speech during a school assembly that was offensive and, while not obscene, fell below the standards of decency the school reasonably wished to advance. The Court upheld the student's punishment based on the school's responsibility to teach students "socially appropriate behavior," and its concomitant desire to "disassociate" the school from inappropriate behavior. *Fraser*, 478 U.S. at 681, 685, 106 S.Ct. at 3166.[2]

In the Court's subsequent decision in *Kuhlmeier* it dealt with a school's prepublication control of the content of a school newspaper. In *Kuhlmeier*, a school principal had banned from a school newspaper an article concerning divorce and pregnancy, and the Eighth Circuit had held that the suppression violated the first amendment. The Supreme Court disagreed with the Eighth Circuit's essentially factual determination that the school had created a public forum. The Supreme Court held that the school had reserved to itself the responsibility to regulate the conduct of the school newspaper in accordance with its perception of the proper function of education. "[E]ducators do not offend the First Amendment by exercising editorial control over the style and content of student speech in *school-sponsored* expressive activities so long as their actions are reasonably related to legitimate pedagogical con-

cerns." *Kuhlmeier*, 108 S.Ct. at 571 (emphasis added).

In initially phrasing the issue, Justice White's opinion for the Court stressed that the issue was "the extent to which educators may exercise editorial control over the contents of a high school newspaper produced *as part of the school's journalism curriculum*." 108 S.Ct. 562, 565 (emphasis added). The opinion explained that the school in its capacity as publisher of a newspaper or producer of a school play may "disassociate" itself from speech which does not meet the school's high standards, citing *Fraser*. *Id.* at 570. The Court thus differentiated between pure student expression with which the Court was concerned in *Tinker* and expression to which the school has lent its name in sponsorship.

> Accordingly, we conclude that the standard articulated in *Tinker* for determining when a school may punish student expression need not also be the standard for determining when a school may refuse to lend its name and resources to the dissemination of student expression.

*Kuhlmeier* at 570.

Pointing to the need of educators to maintain control over the school curriculum, the Court in *Kuhlmeier* used a broad definition of curriculum, which it said encompassed "school-sponsored publications, theatrical productions, and other expressive activities that students, parents and members of the public might reasonably perceive to bear the imprimatur of the school." *Kuhlmeier* at 569. It expressly described the distinction it was drawing between speech protected by the standards of *Tinker* and speech which the educators could regulate as the distinction "between speech that is sponsored by the school and speech that is not." *Id.* at 570 n. 3.[3]

---

**2.** Following *Fraser's* broad language concerning the school's responsibility for promoting socially appropriate behavior, the Eighth Circuit in *Bystrom v. Fridley High Sch.*, 822 F.2d 747 (8th Cir.1987), held that a school board could prohibit "introduction onto [its] property by students ... written material pervaded or characterized by four-letter words that used to be considered unprintable." *Id.* at 753. *Bystrom* did not recognize any distinction between prior re-

straint and post-communication punishment. It was decided before the Supreme Court decided *Kuhlmeier*. The *Bystrom* analysis in our view is not consistent with *Kuhlmeier*.

**3.** *Kuhlmeier* finds resonant support in this circuit's decision in *Nicholson v. Bd. of Educ. Torrance Unified Sch. Dist.*, 682 F.2d 858 (9th Cir. 1982), which also dealt with school control of what went into the newspaper the school itself published as part of the school's educational

In this case the communications, like *Bad Astra,* which the school policy targets for review for censorship purposes are in no sense "school-sponsored." They are therefore not within the purview of the school's exercise of reasonable editorial control. The student distribution of non-school-sponsored material under the Supreme Court's decisions in *Tinker* and *Kuhlmeier* cannot be subjected to regulation on the basis of undifferentiated fears of possible disturbances or embarrassment to school officials, and no more than undifferentiated fear appears as a basis for regulation in this case. There is therefore no justification for this policy, which conditions all distribution of student writings on school premises upon prior school approval. Interstudent communication does not interfere with what the school teaches; it enriches the school environment for the students.

Renton's policy conditions distribution of all written materials on school premises upon prior school review for censorship purposes, and is directed at communications lacking any element of school support or endorsement. It is a blanket policy of unlimited scope and duration. For that reason, we do not need to decide under what more limited circumstances, if any, a school may impose a policy of predistribution review. We hold that Renton's policy is overbroad and violates the appellants' first amendment rights. Our holding is limited to school distribution policies which are content based, and does not pertain to regulations of time, place, and manner of distribution. *Cf. Grayned v. Rockford,* 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2302–03, 33 L.Ed.2d 222 (1972). Nor does our holding affect the ability of the school to punish students for unacceptable or disruptive conduct after it occurs. *See Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

The judgment of the district court is reversed and the case remanded with instructions to enter an order enjoining further enforcement of the review policy and directing the school to purge the plaintiff-students' records of reprimands for violating the policy.

program. In *Nicholson,* this court held that "writers on a high school newspaper do not have an unfettered constitutional right to be free from prepublication review." *Id.* at 863.