**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 8, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

SETH TAYLOR; JACOB COBOS, by
and through his parents Ralph and
Adrienne Cobos; LACY CORMAN, by
and through her parents Gary and
Ladonna Corman; ARIELLE GREEN, by
and through her parents Joseph and
Socorro Green; REED MAY, by and
through his parents Bruce and April May,

      Plaintiffs - Appellants,

v.

ROSWELL INDEPENDENT SCHOOL
DISTRICT; MICHAEL GOTTLIEB, in
his capacity as Superintendent of Schools
for Roswell Independent School District,

      Defendants - Appellees.

No. 11-2242

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 2:10-CV-00606 LFG-ACT)**

---

Mathew D. Staver, Liberty Counsel, Maitland, Florida (Stephen M. Crampton, Mary E.
McAlister, and Matthew H. Krause, Liberty Counsel, Lynchburg, Virginia, and Anita L.
Staver, Liberty Counsel, Maitland, Florida, with him on the briefs), appearing for
Appellants.

Jerry A. Walz, Walz and Associates, Albuquerque, New Mexico, appearing for
Appellees.

---

Before **KELLY, HOLLOWAY,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

The plaintiffs are, or at all relevant times were, high school students from Roswell, New Mexico, who belong to a religious group called "Relentless" ("Plaintiffs").[1] They sued Roswell Independent School District and Superintendent Michael Gottlieb in his official capacity (collectively "the District") seeking declaratory and injunctive relief. Their complaint alleged that school officials violated their First and Fourteenth Amendment rights by preventing them from distributing 2,500 rubber fetus dolls to other

---

[1] When the complaint in this case was filed, Plaintiffs were students at either Goddard or Roswell High. Our review of the record indicates that four of the five plaintiffs have since graduated and one plaintiff, Jacob Cobos, is expected to graduate in May 2013. Plaintiffs seek declaratory and injunctive relief. They do not seek damages, even nominal damages. In *Board of School Commissioners of Indianapolis v. Jacobs*, 420 U.S. 128 (1975) (per curiam), the Supreme Court dismissed as moot a challenge by high school students to regulation of their school newspaper after the Court learned at oral argument that all of the plaintiffs had graduated.

In this case, however, at least one plaintiff, Mr. Cobos, remains in school. He clearly has standing, and his claim is not moot. "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). See also *Campbell v. Buckley*, 203 F.3d 738, 740 n.1 (10th Cir. 2000) ("Because the individual plaintiffs . . . have standing, and because [they] jointly raise the same substantive arguments on appeal . . . there is no need to address the standing of the [other] plaintiffs.") (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)); *Nat'l Rifle Ass'n v. Magaw*, 132 F.3d 272, 278 n.4 (6th Cir. 1997) ("[A]s long as one plaintiff meets the requirements of Article III, the court can adjudicate the issues raised in the complaint.").

We therefore proceed to the merits.

-2-

students.  It also challenged the District's policies requiring preapproval before distributing any non-school-sponsored material on school grounds.

A magistrate judge granted summary judgment for the District on all claims, and Plaintiffs appealed.[2]  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the dismissal of Plaintiffs' free speech, free exercise, and equal protection claims.  We also affirm dismissal of Plaintiffs' facial challenge to Roswell District's preapproval policies.  We note that the public school setting is important to our analysis.

## I.   BACKGROUND

### A. *Factual History*

The five plaintiffs in this case are, or at all relevant times were, students of two high schools, Roswell and Goddard High.  They belong to a religious youth group called Relentless, which is affiliated with a local church called Church on the Move.  Relentless is not affiliated with any school.

Relentless members testified in depositions that they routinely engaged in religious expression at school.  For example, they often spoke to other students, in groups and one-on-one, about their religious beliefs and anti-abortion views; and they regularly prayed, silently and aloud, while on school grounds, including during class.  Plaintiffs were never disciplined or asked to stop these activities.

_____

[2] Both parties consented to proceed before Magistrate Judge Lorenzo F. Garcia, with the understanding that appeal from any judgment entered by the magistrate judge would be to the United States Court of Appeals for the Tenth Circuit.  *See* 28 U.S.C. 636(c); Fed. R. Civ. P. 73(b).

In late 2009, Plaintiffs and other Relentless members began an outreach campaign to express kindness and charity to fellow students and teachers, and to "put God back into the schools." Aplt. Appx., Vol. I at 195. Each week they distributed different items at both schools. A pastor from Church on the Move, Tim Aguilar, led the students in organizing and planning these events and was present on school grounds for the distributions. Relentless initially gave 220 McDonald's chicken salad sandwiches (donated by a church member) to the faculty at both high schools. In ensuing weeks, they distributed to students and faculty hot chocolate, candy canes with religious messages, and "affirmation rocks" with scriptural references painted on one side. Aplt. Appx., Vol. IV at 993-95.

When these distributions began, Roswell District had two policies concerning distribution of non-school related materials on campus. Policy 7110 required advance permission from the District before distribution in any quantity of promotional items or advertisements on campus. A separate, longstanding but unwritten policy required students to obtain permission before on-campus distribution of non-school-sponsored literature. These policies are described in more detail later in this section.

The Relentless students did not seek permission before distributing the previously mentioned items.[3] They were not disciplined, reprimanded, or asked to stop. There is no evidence these distributions caused disruption.

## 1. The Rubber Fetus Doll Distributions

On January 29, 2010, Pastor Aguilar and the Relentless students planned to distribute 2,500 small rubber dolls, one to every student at both schools. Each two-inch doll was designed to be a realistic representation of a human fetus. A card attached to each doll explained that it represented the actual size and weight of a "12 week old baby," that is, a fetus at 12 weeks of gestation. Aplee. Appx., Vol. I at 22-23. One side of the card encouraged students to visit or call the Chaves County Pregnancy Resource Center, a clinic affiliated with Church on the Move. The other side featured a Relentless logo and this scriptural passage:

> *For you formed my inward parts; You wove me in my mother[']s womb. I will give thanks to You, for I am fearfully and wonderfully made; Wonderful are your works, And my soul knows it very well.*
>
> *Psalms 139:13-14*

Aplee. Appx., Vol. I at 23.

---

[3] Although it is undisputed that the Relentless students did not seek permission for the early distributions, Pastor Aguilar testified in his deposition that he and other adult organizers from the church sought and received verbal permission for at least one distribution. He could not recall which administrator gave permission or for which distribution.

At Goddard High, Pastor Aguilar and eight or nine Relentless students set up tables in the lobby and began the distribution about 7:30 a.m. They approached every student entering the school and offered a doll. The entrances were not blocked, and the Relentless members allowed those who declined to take a doll to continue on their way.

Assistant Principal Brian Luck arrived and noticed the distribution. He went to his office and radioed other administrators to ask whether the students had approval for the distribution. Assistant Principal Michelle Edgett responded that the students did not have approval and told Mr. Luck he should "probably" take possession of the dolls.[4] Aplt. Appx., Vol. I at 175. On his way back to the lobby, Mr. Luck saw several students throwing what looked like small rubber balls at the wall. The "balls" turned out to be dismembered heads of the rubber fetus dolls. Several female students stopped him to complain. Relentless members were not among those dismembering or throwing the dolls.

Mr. Luck approached the Relentless students and said, "It's time to shut this down. . . . Some people are getting offended." Aplt. Appx., Vol. IV at 996. He took the remaining dolls and told the students they would be returned at the end of the day. At this point, the Relentless group had distributed more than 300 dolls at Goddard High.

_____

[4] Mr. Luck testified at his deposition that at the time of these events, he was newly appointed as an Assistant Principal and did not have the authority to grant or deny approval for student distributions on campus.

Later that morning, a Goddard High administrator called the principal of Roswell High, Ruben Bolaños, to ask if a similar distribution was underway at Roswell High. Principal Bolaños was not on campus, so he telephoned a campus security officer and instructed him to investigate and to confiscate the dolls "[i]f it's a disruption to the educational process." Aplt. Appx., Vol. I at 123. Two campus security guards at Roswell High investigated and eventually determined the dolls should be confiscated.

Both schools experienced doll-related disruptions that day. Many students pulled the dolls apart, tearing the heads off and using them as rubber balls or sticking them on pencil tops. Others threw dolls and doll parts at the "popcorn" ceilings so they became stuck. Dolls were used to plug toilets. Several students covered the dolls in hand sanitizer and lit them on fire. One or more male students removed the dolls' heads, inverted the bodies to make them resemble penises, and hung them on the outside of their pants' zippers.

Teachers at both schools complained that students' preoccupation with the dolls disrupted classroom instruction. While teachers were trying to instruct, students threw dolls and doll heads across classrooms, at one another, and into wastebaskets. Some teachers said the disruptions took eight to 10 minutes each class period, and others said their teaching plans were derailed entirely. An honors freshman English class canceled a scheduled test because students had become engaged in name calling and insults over the topic of abortion. A Roswell security officer described the day as "a disaster" because of the dolls. Aplt. Appx., Vol. II at 447.

About two weeks later, on February 11, 2010, Relentless attempted to distribute the dolls again, believing it was their Christian duty and constitutional right. Administrators at both schools immediately stopped this second distribution. A Goddard High administrator announced over the public address system that "[n]othing is to be passed out that is not school related," and warned that "there will be disciplinary actions taken" if the distribution continued. Aplt. Appx., Vol. I at 21. At Roswell High, Principal Bolaños emailed instructions to the faculty that rubber fetuses should be confiscated and any student distributing them should be referred to the administration.

On the same day, other students at Roswell High were allowed to distribute Valentine's Day-related items such as candy, cards, and stuffed animals. [*Id.*] The record does not tell whether any students distributed large quantities of these items or whether they received prior approval. There is no evidence of disturbance from the Valentine's Day-related distributions.

In late February, Relentless's legal counsel sent a written demand to the District that the group be permitted to conduct the fetus doll distribution. Around this time, Superintendent Michael Gottlieb, administrators of both schools, and the senior pastor of Church on the Move, Troy Smotherman, met to discuss this issue (the "Gottlieb meeting"). During the Gottlieb meeting, participants discussed the possibility that Relentless might implement a less controversial message of abstinence. Superintendent Gottlieb asked Pastor Smotherman whether Relentless would consider distributing the fetus dolls more quietly, suggesting the group could "just put these babies in [students']

backpacks . . . without the big to-do." Aplt. Appx., Vol. I at 114. The meeting ended without resolution.

## 2. Later Relentless Distributions

After the meeting, Relentless varied their distributions. Later in February, they distributed wristbands with the message "I'm Worth Waiting For." Aplt. Appx., Vol. IV at 999. The group did not seek prior approval, which violated Roswell District's standard practice. Both schools allowed the distributions to continue, but two Relentless students from Goddard High, including one plaintiff, were required to attend "Saturday school" for violating the preapproval policy.

In subsequent months, Relentless distributed more items featuring scriptural quotes and religious and anti-abortion messages, including stickers, plastic Easter eggs, pencils, and dog tags. Relentless sought and received permission to distribute the Easter eggs, but Goddard administrators asked them not to block entrances or approach other students as they entered the building. It is not clear whether they sought permission for the other distributions, but there is no evidence of any disruption from any distributions that occurred after the Gottlieb meeting. [Aplt. Appx., Vol. IV at 1042.]

In September 2010, after the next school year had begun, Relentless "surreptitiously" left 1,000 doughnuts in the faculty lounges of both schools, with stickers featuring the Relentless logo and a quote from Galatians 6:9, "Let us not grow weary in well doing." Aplt. Appx., Vol. IV at 1000-01. One Relentless member who is not a plaintiff in this case was disciplined for entering the faculty lounge after being told not to

do so, but no other disciplinary actions were taken. The doughnuts were removed in part due to "food safety concerns." *Id.* at 1001.

3. **Roswell District Policies Regarding On-Campus Distributions**

Two Roswell District policies have been referred to in this case. First, Policy 7110 was in place before the rubber doll distribution. It requires the school principal's preapproval to engage in promotional activities on campus, including advertising or solicitations. Policy 7110 bans outright the promotion of certain items on campus, such as alcohol and drugs. It does not mention religion.

At the time of the rubber doll distribution, the District had a long-standing, unwritten policy of requiring students to obtain approval before distributing non-school-sponsored material on school grounds. In May 2010, the District formalized this unwritten policy when it promulgated Policy 5195, captioned "Distribution of Non School Sponsored Literature." Aplt. Appx., Vol. I at 186-87. This policy requires that students obtain approval from the school administration before distributing more than 10 copies of "any non-school sponsored literature."

Section 2 of the policy provides that approval may be withheld if the school district administration "reasonably determines" that the distribution:

> a. Would cause a substantial disruption or a material interference with the normal operation of the school or school activities.
> b. Is potentially offensive to a substantial portion of the school community due to the depiction or description of sexual conduct, violence, morbidity or the use of language which is profane or obscene and which is inappropriate for

-10-

> the school environment as judged by the standards of the
> school community.
>
> c. Is libelous or which violates the rights of privacy of any
> person.
> d. Is false or misleading or misrepresents facts.
> e. Is demeaning to any race, religion, sex, or ethnic group.
> f. Encourages violation of local, state or federal laws.

Aplt. Appx., Vol. I at 186.

Sections 1 and 3 of the policy describe certain procedural safeguards. The District must approve or deny a distribution request within five school days. This time may be extended only with written approval of Superintendent Gottlieb. The District must provide a written explanation of the reasons for any denial. Students whose requests are denied have a right to two appeals. The first appeal is made directly to Superintendent Gottlieb, with a final appeal to the Board of Education. If a student appeals to the Board, it must provide a hearing within 10 school days and render its decision at its next regular meeting.

Section 4 of the policy provides definitions of terms, including "distribution" and "non school sponsored." Aplt. Appx., Vol. I at 186. Sections 5 and 6 give school officials the right to "designate a time, location and means by which the distribution may take place," and to revoke approval if the distribution causes a substantial disruption. Aplt. Appx., Vol. I at 186-87.

## B. *Procedural History*

Plaintiffs' Second Amended Complaint sought injunctive relief and alleged three counts. Count I included two First Amendment speech claims. First, Plaintiffs brought a facial challenge against the District's preapproval policies for non-school-sponsored material, alleging the policies are unconstitutional prior restraints and are unconstitutionally vague. Second, they challenged the policies as applied to Plaintiffs, claiming that the District's refusal to allow them to distribute the fetus dolls violated their free speech rights. Count II alleged violation of Plaintiffs' free exercise rights under a so-called hybrid claim theory.[5] Finally, Count III alleged that the District discriminated against Plaintiffs in violation of the Fourteenth Amendment's Equal Protection Clause.

At the close of discovery, the parties filed cross-motions for summary judgment. No oral argument was held. The magistrate judge issued a 64-page opinion granting summary judgment for the District on all claims. Plaintiffs appealed on all counts, but abandoned the hybrid claim theory with respect to its free exercise claim.

---

[5] The hybrid claim theory allows a court to apply strict scrutiny when "a free exercise claim is coupled with some other constitutional claim" and the plaintiff makes "a colorable showing of infringement of [the] companion constitutional right." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295 (10th Cir. 2004) (quotations omitted). We have recognized this theory with reservations, noting that the "hybrid-rights theory has been roundly criticized from every quarter and many have pointed out the danger of interpreting [it] broadly." *Id.* at 1296. On appeal, Plaintiffs argue their free exercise claim but abandon the hybrid claim theory. We therefore do not discuss the hybrid claim theory in this opinion.

## II. DISCUSSION

Plaintiffs claim that when the schools prevented them from distributing the rubber fetus dolls, their constitutional rights to free speech, free exercise of religion, and equal protection were violated. They also claim that the speech violation was the product of school policies that are unconstitutional on their face as prior restraints and for reasons of vagueness and overbreadth.[6] As we explain below, Plaintiffs' free speech challenges fail because school officials reasonably forecasted that the distribution would cause substantial disruption and because the distribution did cause substantial disruption. Plaintiffs' free exercise and equal protection claims fail because the decision to stop the distribution was not based on religion, and Plaintiffs failed to show they were treated differently from similarly situated students.

Plaintiffs' facial challenge to the school policy also fails. The policy is not unconstitutional under the prior restraint doctrine because it constrains official discretion and contains adequate procedural safeguards—and because it applies to the school environment where greater deference is given to school officials. It is not void for vagueness because students of ordinary intelligence can understand its meaning and it neither authorizes nor encourages arbitrary or discriminatory enforcement. As we explain below, we do not address the overbreadth issue.

---

[6] Plaintiffs did not raise an overbreadth claim in their complaint, but the parties argued the theory before the magistrate judge, who addressed overbreadth in the decision granting summary judgment.

A. *Standard of Review*

We review a grant of summary judgment de novo, under the same standard applied by the district court (or in this case, the magistrate judge). *Clinger v. N.M. Highlands Univ.*, 215 F.3d 1162, 1165 (10th Cir. 2000). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is genuinely disputed if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Witt v. Roadway Exp.*, 136 F.3d 1424, 1429 (10th Cir. 1998). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* "[W]e draw all reasonable inferences from the evidence in favor of" Plaintiffs as the nonmoving party. *Id.* Summary judgment for the District is appropriate only if "the record taken as a whole could not lead a rational trier of fact to find for the" Plaintiffs. *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1428 (10th Cir. 1996).

In First Amendment cases, we are obligated "to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011) (quotations omitted); *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984); *Barker v. Del City*, 215 F.3d 1134, 1137 (10th Cir. 2000).

We first consider the free speech challenge to the District's refusal to allow the rubber fetus distribution. Second, we address Plaintiffs' facial challenge to the District's

-14-

policies as unconstitutional prior restraints and for vagueness.  Third, we consider the

Plaintiffs' free exercise claim.  Finally, we address the equal protection claim.

## B. *The Free Speech As-Applied Claim*

The First Amendment guarantees the right to free expression and is applicable to

the states through the Due Process Clause of the Fourteenth Amendment.  *Gitlow v. New*

*York*, 268 U.S. 652, 666 (1925); *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937); *Cannon*

*v. City and Cnty. of Denver*, 998 F.2d 867, 871 (10th Cir. 1993).

The magistrate judge analyzed Plaintiffs' free speech claim under two standards

developed in *Tinker v. Des Moines*, 393 U.S. 503 (1969), and *Hazelwood School District*

*v. Kuhlmeier*, 484 U.S. 260 (1988), and held that the District was entitled to summary

judgment under both standards.  We affirm under the *Tinker* standard.  *Hazelwood* is

inapplicable because the expression at issue here is private student speech and not school-

sponsored speech.

Two important questions are *not* at issue.  First, this case does not turn on whether

the content of Plaintiffs' message warrants First Amendment protection—there is no

question that it does.  The record shows Plaintiffs meant to convey a religious and

political message when they distributed the rubber dolls, and the Constitution requires

they be permitted to express these views at school in some form.  *See Tinker*, 393 U.S. at

513; *Williams v. Eaton*, 443 F.2d 422 (10th Cir. 1971).  For example, the District almost

certainly may not prevent Plaintiffs from sharing their religious views in nondisruptive

small group discussions with other students who wish to participate; nor can the District

-15-

exercise editorial control over the content of Plaintiffs' private expression or decide whether to approve Plaintiffs' distribution of materials on the basis of their viewpoint. *See Tinker*, 393 U.S. at 509. Insofar as the District has acknowledged that Plaintiffs' many other religiously-themed distributions at both schools did not disrupt the school environment, it correctly allowed those distributions to continue. *See id.; Williams*, 443 F.2d at 431.

Second, the parties do not contest that the District was allowed, under *Tinker* and *Bethel School District No. 403 v. Fraser*, 478 U.S. 675 (1986), to confiscate already-distributed rubber dolls from any students who threw them, used them to harm school property, or displayed them as props for lewd or obscene expressions of their own.

What *is* contested is whether the District violated Plaintiffs' free speech rights when it stopped their on-campus distribution of large quantities of the rubber fetus dolls. The answer depends on whether school officials reasonably forecasted that this particular form of expression (i.e., mass distribution of hundreds or thousands of three-dimensional rubber dolls to public high school students during the school day) would create a substantial disruption to school discipline. *Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996).

In the following discussion, we determine that Plaintiffs' claims involve private—that is, non-school-sponsored—student speech and therefore fall under the *Tinker* standard. Applying *Tinker*, we hold that the District did not violate Plaintiffs' free speech

-16-

rights because it reasonably forecasted that distribution of the rubber dolls would lead to a substantial disruption.

### 1. The *Tinker* Standard Applies to Plaintiffs' Distribution

Restrictions on student speech in public schools are analyzed under one of two standards. *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1225 (10th Cir. 2009). *Tinker* governs private student speech; *Hazelwood* governs school-sponsored speech. *Corder*, 566 F.3d at 1225.[7]

Private student expression that is unconnected to any school-sponsored activity is subject to the more stringent *Tinker* standard. *Morse v. Frederick*, 551 U.S. 393, 405-06 (2007). In *Tinker*, the plaintiffs were punished for wearing black armbands at school to express their disagreement with U.S. involvement in the Vietnam War. *Tinker*, 393 U.S. at 504. The Supreme Court held that the school could not restrict this speech unless the school reasonably forecasted that the speech would cause substantial disruption to the school environment. *Id.* at 509.[8]

---

[7] A third standard addresses speech in public schools that can be characterized as "government speech, such as the principal speaking at a school assembly." *Axson-Flynn*, 356 F.3d at 1285 (quotations omitted). As the current case involves student speakers, this standard is not relevant.

[8] The Tenth Circuit first applied the *Tinker* standard in the 1971 case of *Williams v. Eaton*, where we held that college football players had a free speech right to wear black armbands during a game to protest the racial policies of the other team's school. 443 F.2d 422, 430-32 (10th Cir. 1971).

In contrast, the Supreme Court has explained that student speech is analyzed under the *Hazelwood* standard when "students, parents, and members of the public might reasonably perceive [the speech] to bear the imprimatur of the school." *Morse*, 551 U.S. at 405. At issue in *Hazelwood* was a school's decision to censor the content of a high school newspaper published as part of the school's journalism program. *Id.* Schools "do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities," provided the restrictions "are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273.

In the present case, "[n]o one would reasonably believe" the distribution of rubber fetuses "bore the school's imprimatur." *Morse*, 551 U.S. at 405. As in *Tinker*, Plaintiffs were expressing their private views, and their expression was not part of any school-sponsored program. The *Tinker* standard therefore applies. *See Roberts v. Madigan*, 921 F.2d 1047, 1057 (10th Cir. 1990) ("[I]f the speech involved is not fairly considered part of the school curriculum or school-sponsored activities, then it may only be regulated if it would materially and substantially interfere with the requirements of appropriate discipline." (quotations omitted)).

2. **The District's Actions Did Not Violate Plaintiffs' Free Speech Rights**

   a. *Further Background on the* Tinker *Standard*

   Under *Tinker*, a public school may not restrict private student expression unless the school reasonably forecasts it "would materially and substantially interfere with the

requirements of appropriate discipline in operation of the school," or "impinge upon the rights of other students." *Tinker*, 393 U.S. at 505-06, 509.[9]

A disruption need not actually materialize. School officials may act to prevent problems as long as the situation "might reasonably [lead] authorities to forecast" substantial disruption or interference with the rights of others. *Id.* at 514. This forecast must be reasonable. Officials may not restrict speech based on "undifferentiated fear or apprehension of disturbance" or a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Id.* at 508-09.

For a school's forecast to be reasonable, courts generally require that it be based on a "concrete threat" of substantial disruption. *Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 262 (3d Cir. 2002). *Tinker* rejected the idea that a "silent, passive" expression that merely provokes discussion in the hallway constitutes such a threat, particularly if that expression is political. 393 U.S. at 514. The Second and Third Circuits have reinforced this notion, overturning schools' bans on t-shirts criticizing George W. Bush or featuring comedian Jeff Foxworthy. *Guiles v. Marineau*, 461 F.3d 320 (2d Cir. 2006); *Sypniewski*, 307 F.3d at 254.[10]

---

[9] Subsequent Supreme Court cases have allowed schools to restrict student speech that is lewd or patently offensive or promotes illegal drug use. *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 685 (1986); *Morse v. Frederick*, 551 U.S. 393, 395 (2007). These cases offer useful insight for understanding *Tinker*'s substantial disruption test.

[10] We note, however, that several circuits (including ours) have upheld restrictions on passive, silent expression—even political expression—where it is clearly associated

Continued . . .

When the speech is neither passive nor silent, restrictions are more readily (but not always) upheld. For example, the Ninth Circuit held that student athletes were constitutionally protected in peacefully circulating a petition criticizing their coach, but upheld the school's decision to suspend them for holding a protest before a sporting event and refusing to board the team bus. *Pinard v. Clatskanie Sch. Dist.*, 467 F.3d 755 (9th Cir. 2006). The court found the protest was not protected because it created a substantial disruption with the operation of the school basketball program. *Id*. at 769. *See also Morse*, 551 U.S. at 397; *Fraser*, 478 U.S. at 678.

When school officials reasonably forecast substantial disruption, they have discretion to restrict forms of student speech that might otherwise be protected in a non-school setting. "'[T]he First Amendment gives a high school student the classroom right to wear Tinker's armband, but not Cohen's jacket.'" *Fraser*, 478 U.S. at 682 (quoting *Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1057 (2d Cir. 1979) (Newman, J., concurring in

---

Cont.

with past school violence or substantial disruption. For example, in *West v. Derby Unified School District*, 206 F.3d 1358 (10th Cir. 2000), we upheld a school policy prohibiting students from displaying the Confederate flag, finding the school reasonably forecasted substantial disruption due to past racial tension in the school context associated with that image. *Id.* at 1365. *See also Defoe v. Spiva*, 625 F.3d 324 (6th Cir. 2010) (upholding school's ban on Confederate flag); *BWA v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 738-41 (8th Cir. 2009) (same); *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008) (same). *Cf. Sypniewski v. Warren Hills Regional Bd. of Educ.*, 307 F.3d 243, 262 (3d Cir. 2002) (rejecting school's ban on t-shirt featuring comedian Jeff Foxworthy based on a finding that the word "redneck" was not associated closely enough with a racial gang at the school known as the "Hicks").

-20-

the result) (referring to *Cohen v. California,* 403 U.S. 15 (1971), in which the Supreme Court found an adult plaintiff had a First Amendment right to wear a jacket bearing profanity regarding the military draft in a courthouse)); *see e.g.*, *West v. Derby Unified Sch. Dist. No. 260*, 206 F.3d 1358, 1366 (10th Cir. 2000) (upholding school's ban on displaying a Confederate flag).

  b.  Tinker *Applied to the Fetus Doll Distribution*

Plaintiffs' distribution conveyed a political and religious message and would likely merit First Amendment protection outside the school context. Inside the school walls, however, we must consider whether the expression was, or was reasonably forecast to be, disruptive. Unlike in *Tinker*, the expression here was neither silent nor passive. It involved proactive contact with large numbers of other students. The items being distributed remained on school grounds in the hands of students throughout the school day. The sheer number of items also created strong potential for substantial disruption.

Furthermore, these fetus dolls were made of rubber—a material that could easily be, and was, pulled apart, bounced against walls, and stuck to ceilings. The dolls' small size made them tempting projectiles and toilet-clogging devices. This scenario carries more potential for disruption than the passive, silent act of wearing a t-shirt or a black armband. And that potential quickly came to fruition. The record is replete with reports of doll-related disruptions throughout the day on January 29, 2010, including substantial disruptions to classroom instruction, damage to school property (the ceilings and plumbing), and risks to student safety (the fire-starting and doll-throwing).

-21-

Plaintiffs note that most disruptions occurred only because of wrongful behavior of third parties and that no Plaintiffs participated in these activities. They argue that preventing their speech because of bad acts of others amounts to banning leafleting because of litterbugs. *See Jews for Jesus v. Mass. Bay Transp. Auth.*, 984 F.2d 1319, 1324-25 (1st Cir. 1993). This argument might be effective outside the school context, but it ignores the "special characteristics of the school environment," *Tinker*, 393 U.S. at 506, where the government has a compelling interest in protecting the educational mission of the school and ensuring student safety. *See Morse*, 551 U.S. at 406-07; *Fraser*, 478 U.S. at 682; *New Jersey v. T.L.O.*, 469 U.S. 325, 340 (1985); *PeTA v. Rasmussen*, 298 F.3d 1198, 1205 (10th Cir. 2002).[11]

Plaintiffs also argue that the magistrate judge ignored disputes of material fact regarding the District's reasons for shutting down the distribution. They stress Assistant Principal Luck's statement to Plaintiffs at the time he confiscated the fetus dolls: "It's time to shut this down . . . Some people are getting offended." Aplt. Appx., Vol. IV at

---

[11] Plaintiffs do not cite (and we have not found) case law holding that school officials' ability to limit disruptive expression depends on the blameworthiness of the speaker. To the contrary, the *Tinker* rule is guided by a school's need to protect its learning environment and its students, and courts generally inquire only whether the potential for substantial disruption is genuine. For example, in *West*, we upheld a school's ban on the Confederate flag because the flag was associated with racial violence in the school environment, but we did not examine whether the student who had displayed the flag was actually advocating violence. 206 F.3d at 1365. Moreover, there is no indication in this case that the problematic student disruptions were aimed at stopping plaintiffs' expression, and plaintiffs did not otherwise develop such an argument.

996.  They urge us to infer from this that Mr. Luck chose to stop the distribution solely because he was personally offended, or was worried that others would be offended, by Plaintiffs' religious, anti-abortion message.  The District says Mr. Luck was referring to the non-Relentless students' dismemberment and throwing of the dolls, which he and other students found offensive.  Plaintiffs reject this explanation, describing Mr. Luck's testimony about the hallway disruptions and the students' complaints as incredible.

We agree that Mr. Luck's statement lacked specificity, but we are not convinced Plaintiffs' inference is reasonable.  Plaintiffs provide no evidence to dispute Mr. Luck's deposition testimony about the hallway disruptions or the complaints of the two female students.  We see no reason to discount this testimony.  Viewing evidence in light most favorable to Plaintiffs does not extend to ignoring undisputed evidence that undermines their position.

Even if we accepted Plaintiffs' interpretation of Mr. Luck's statement, this claim would still fail.  To survive summary judgment, a disputed fact must be material.  Fed. R. Civ. P. 56(a).  In assessing materiality, "[w]e are obligated to examine the record as a whole . . . and evaluate what the school actually did, as opposed to carving out an isolated statement from the record."  *Fleming v. Jefferson Cnty. Sch. Dist.*, 298 F.3d 918, 931 (10th Cir. 2002).  Any dispute as to the exact meaning of Mr. Luck's statement is not material when viewed against the whole record.

Plaintiffs argue that the District's decision to stop the distribution was unjustified because the fetus dolls were confiscated before any substantial disruption had occurred.

-23-

But the District was not obligated to wait until a substantial disruption materialized, so long as its forecast was reasonable. The substantial disruptions that actually transpired show the forecast was reasonable.

Finally, even if Mr. Luck initially stopped the distribution for impermissible reasons, Plaintiffs could not defeat summary judgment. At Roswell High, the dolls were not confiscated until security guards had observed actual disruptions. As for Goddard High, Plaintiffs' reading of Mr. Luck's statement shows at most that the school's decision to stop the distribution was unjustified for some short period of time—likely a few minutes, but no more than one or two hours. Because Plaintiffs seek only injunctive relief, any claim they could have under this fact interpretation became moot once actual substantial disruptions occurred.

In short, there is ample undisputed evidence that the District had permissible reasons for stopping the distribution. Plaintiffs' free speech rights were therefore not violated.

### C. *Facial Challenge to the District's Preapproval Policies*

A facial challenge involves "an examination of whether the terms of the [policy] itself measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contain a constitutional infirmity that invalidates the [policy] in its entirety." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012) (quotations omitted).

Plaintiffs assert that District policies are unconstitutional on their face as prior restraints and for reasons of vagueness and overbreadth. We begin our analysis by defining the scope of our review, which is limited to considering Plaintiffs' prior restraint and vagueness arguments as applied to relevant portions of Policy 5195. We next consider Plaintiffs' prior restraint argument. Finally, we address vagueness.

1. **Scope of Plaintiffs' Facial Challenge**

As a preliminary matter, we must consider the scope of Plaintiffs' facial challenge. For reasons we discuss below, our review is limited in two ways. First, the only District policy properly before us is the portion of Policy 5195 relevant to Plaintiffs' desired speech. This includes Policy 5195's preapproval requirement and accompanying procedural safeguards, together with the substantive restriction included in subsection 2.a. Second, because Plaintiffs have not adequately developed an overbreadth argument, our review is limited to their prior restraint and vagueness arguments.

a. *Policies Included in Our Facial Review*

Plaintiffs attempt a facial attack on every District policy that could potentially govern student speech, including all of Policy 5195, Policy 7110, and the unwritten standard practice that preceded Policy 5195. This sweeping scope of review would be excessive. "Facial challenges are strong medicine, and thus we must be vigilant in applying a most exacting analysis to such claims." *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1157 (10th Cir. 2006) (considering facial challenge on prior restraint and vagueness grounds).

"Facial challenges are disfavored for several reasons" including the risk of "premature interpretation" because such challenges "often rest on speculation." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (upholding a state election law over political party's facial challenge that the law violated its constitutional right to free association). Additionally, broad facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (quotations omitted). Plaintiffs do not cite, and we have not encountered, binding or persuasive case law allowing, much less requiring, a court to entertain expansive facial challenges to whole collections of laws or policies like the challenge they attempt here.

We therefore decline to perform such a sweeping review. Our inquiry concerns those portions of the District's policies that pertain to the particular speech in which Plaintiffs wish to engage. Formal adoption of Policy 5195 subsumed the unwritten standard practice, rendering it moot with respect to our facial analysis.[12] For similar reasons, we do not consider the facial constitutionality of Policy 7110. Although the record indicates that, before the adoption of Policy 5195, some school officials believed Policy 7110 applied to the rubber fetus distribution, the promulgation of Policy 5195, if

---

[12] Policy 5195 was promulgated largely in response to the rubber fetus controversy.

upheld here, renders Policy 7110 immaterial to future student distributions like those

Plaintiffs wish to conduct.

Finally, our facial review includes only relevant portions of Policy 5195. The

District refused permission for the rubber fetus distribution because it believed the

distribution was disruptive. This justification is covered by subsection 2.a., which allows

school officials to restrict any distribution that "[w]ould cause a substantial disruption or

a material interference with the normal operation of the school or school activities."

Aplt. Appx., Vol. I at 186. Other bases for restriction covered by subsections 2.b through

2.f—for example, because the material is obscene or illegal, are irrelevant here.

Our review is therefore limited to the Policy 5195's preapproval requirement and

accompanying procedural safeguards, together with the substantive *Tinker* restriction in

subsection 2.a.[13]

---

[13] The question of which policies are relevant to Plaintiffs' desired speech (and are therefore appropriately included in our review) should not be confused with the idea of prudential or third-party standing. Generally speaking, "a person to whom a [policy] may constitutionally be applied will not be heard to challenge that [policy] on the ground that it may conceivably be applied unconstitutionally to others . . ." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). But "within the context of the First Amendment," courts have recognized "a lessening of prudential limitations on standing," which allows a plaintiff to facially challenge a law or policy even if the plaintiff's own expression is not constitutionally protected. *ACORN v. City of Tulsa*, 835 F.2d 735, 738 (10th Cir. 1987). This is known as an overbreadth challenge, which, as we explain below, has not been adequately raised and argued in this appeal. *See Broadrick*, 413 U.S. at 610.

b.  *Arguments Included in Our Facial Review*

Plaintiffs assert that the District's policy is facially unconstitutional as a prior restraint and for reasons of vagueness and overbreadth.  Although they develop prior restraint and vagueness arguments by addressing the legal standards and case law specific to these theories, they fail to do the same for overbreadth.

The overbreadth doctrine is an alternative facial challenge theory similar to, but distinct from, vagueness.  *See Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005) ("The Supreme Court has traditionally viewed vagueness and overbreadth as logically related and similar doctrines." (quotations omitted)); *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497-98 (1982); *West,* 206 F.3d at 1367-68.  A law or policy "may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *United States v. Stevens*, 130 S. Ct. 1577, 1587 (2010) (quotations omitted).

Although Plaintiffs make several conclusory statements that the District's policy is overbroad, they do not address—or even acknowledge—the legal standard for overbreadth.  Nor do they explain why they believe the policy is overbroad.[14]

---

[14] Although we do not consider overbreadth, it is unlikely such a theory would succeed.  To prevail on an overbreadth theory, a plaintiff must show that a challenged policy prohibits a "broad range of protected conduct," and there must be "a realistic danger that the [policy] itself will significantly compromise recognized First Amendment protections of parties not before the Court."  *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 796, 800-01 (1984).  "The possibility of an impermissible

Continued . . .

"[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief." *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007). Our review of Plaintiffs' facial challenge is therefore limited to their prior restraint and vagueness arguments.

## 2. **Policy 5195 is Not an Unconstitutional Prior Restraint**

The magistrate judge upheld the preapproval requirement because it sets reasonable limits on student speech and has adequate procedural safeguards. We agree.

We note at the outset that Policy 5195's preapproval requirement does not affect all private student expression. It does not apply to spoken communication. For example, the policy does not require Relentless students to seek preapproval for many of the expressive activities in which they routinely engage on school grounds, such as sharing their religious and anti-abortion views with other students or praying silently and out loud on school grounds and in the classroom.

The preapproval requirement also does not affect symbolic expression. Students are not required, for example, to obtain permission before wearing black armbands,

_____

Cont.

application of a [policy] does not in itself mean the [policy] is substantially overbroad." *ACORN*, 835 F.2d at 744.

As we will explain, the substantive restriction at issue, subsection 2.a, restates the *Tinker* standard. *Tinker* represents the most speech-protective standard articulated by the Supreme Court in school speech cases. *See Morse*, 551 U.S. at 417-419 (Thomas, J., concurring). It is doubtful that Plaintiffs could demonstrate that a majority of applications of the *Tinker* standard would be unconstitutional.

-29-

carrying or displaying signs or posters, engaging in silent or non-silent protests, or circulating a petition. There may be circumstances under which school officials could, subject to *Tinker's* limitations, constitutionally restrict these expressive activities during or after the fact, but the preapproval requirement does not apply.

The only type of expressive activity for which students must seek preapproval is the distribution of non-school-sponsored materials, and even then preapproval is required only if students intend to distribute more than 10 items on school grounds.

We begin our analysis of Plaintiffs' prior restraint argument by explaining where the preapproval requirement fits in a prior restraint analysis. We then analyze the policy, concluding that it is constitutionally permissible in light of its procedural protections, its substantive standard, and the special context of the school environment.

a. *What Is a Prior Restraint?*

Generally, a "prior restraint" restricts speech in advance on the basis of content and carries a presumption of unconstitutionality. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992); Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 978-79 (4th ed. 2011); *see also United States v. Quattrone*, 402 F.3d 304 (2d Cir. 2005) ("A prior restraint on speech is a law, regulation or judicial order that suppresses speech . . . on the basis of the speech's content and in advance of its actual expression.") (citing *Alexander v. United States*, 509 U.S. 544, 550 (1993)). Prior restraints generally take one of two classic forms: judicial injunctions and administrative licensing schemes. *See* Chemerinsky, *supra*, at 978-79.

A judicial injunction is usually a court order forbidding specific speakers from specific expression. A well-known example comes from *Nebraska Press Association v. Stuart*, 427 U.S. 539 (1976), where the Supreme Court held unconstitutional a state court injunction preventing the media from publishing certain information about a preliminary hearing in an ongoing murder prosecution. *Id.* at 561.

In contrast, an administrative licensing scheme does not usually target a particular speaker or instance of speech. Rather, it requires a speaker to obtain approval before engaging in certain forms of speech in a given forum, sometimes based on the volume or scale of the intended speech. A typical example comes from *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992), in which a local ordinance required citizens to obtain a permit before holding a parade or assembly on public property. *Id.*

In the present case, the District's preapproval requirement resembles an administrative licensing scheme because it requires preapproval for student speech that is non-school-related and involves distribution of more than 10 items of literature on school grounds.

Licensing restrictions that are content neutral and restrict only the time, place, and manner of speech are not subjected to the most rigorous prior restraint scrutiny. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781 (1989) (upholding licensing restriction on sound amplification in city park as a content neutral time, place, and manner restriction

without applying prior restraint analysis).[15] The District's preapproval requirement

appears to be content neutral on its face. But although it includes content neutral time,

place, and manner restrictions, it allows officials to use discretion in deciding whether to

allow speech, and nothing in the policy prevents officials from considering the subject

matter of the speech when predicting whether it will cause substantial disruption. *See*

*Forsyth Cnty.*, 505 U.S. at 134 ("Listeners' reaction to speech is not a content-neutral

basis for regulation."). This element of discretion calls for prior restraint scrutiny. *See*

*id*. at 130.

b. *The Preapproval Requirement Is Valid*

Administrative pre-approval prior restraints can survive First Amendment review

only when they meet very high standards established by the Supreme Court. Two

considerations save the pertinent portions of Policy 5195 from facial constitutional attack.

First, the policy contains procedural safeguards, including the opportunity to bring two

---

[15] A policy is content neutral if its restrictions do not hinge on either the viewpoint or the subject manner of the speech. *Hill v. Colorado*, 530 U.S. 703, 723 (2000); *see R.A.V.*, 505 U.S. at 391 (example of a viewpoint restriction in the form of an ordinance prohibiting expression of racist messages while allowing speech in favor of racial tolerance and equality); *Consolidated Edison Co. v. Public Service Comm'n*, 447 U.S. 530, 532 (1980) (example of a subject matter restriction in the form of a statute prohibiting utility companies from discussing controversial issues of public policy in inserts included in customer bills). Subject matter regulation is "not as obnoxious as viewpoint-based regulation," but either form of content regulation raises constitutional concerns. *Hill*, 530 U.S. at 723.

Content-neutral "time, place, and manner" restrictions must be narrowly tailored to serve a significant government interest and must leave open ample alternative channels for communication. *Id*. at 725-26.

appeals.  Second, the policy imposes substantive constraints on official discretion that are

constitutionally sufficient in the special context of a public school, where students enjoy

free speech rights but not to the same extent as they would in the public square.

Additionally, we note that our conclusion is consistent with the trend of decisions of our

sibling circuits on this issue.

### i.  Procedural Safeguards

In non-school settings, an administrative licensing process can overcome the

presumption of unconstitutionality only if it contains "procedural safeguards designed to

obviate the dangers of a censorship system," i.e., content discrimination.  *City of Littleton*

*v. Z.J. Gifts D-4*, 541 U.S. 774, 779 (10th Cir. 2004) (quoting *Freedman v. State of*

*Maryland*, 380 U.S. 51, 58 (1964)); *see also Hill v. Colorado*, 530 U.S. 703, 723 (2000)

(discussing the dangers of content discrimination, which includes both viewpoint and

subject matter discrimination).

The Supreme Court first emphasized the importance of procedural safeguards in

*Freedman v. State of Maryland*, where it considered a challenge to a statute requiring a

film to receive advanced approval before public screening.  380 U.S. at 52.  The statute

included no provision to ensure applicants would receive a timely decision from the

"censorship board," and it made the board's decision final with no option to appeal a

denial without undertaking a time-consuming lawsuit.  *Id.* at 54.  The Court rejected the

-33-

statute because it contained no "procedural safeguards designed to obviate the dangers of a censorship system." *Id*. at 58.[16]

Several decades later, the Court decided *Forsyth County v. Nationalist Movement*, which involved a licensing scheme that regulated use of public property for expressive activity. 505 U.S. at 133. A county ordinance allowed officials to vary the fee imposed for a parade or assembly permit based on the estimated cost for law enforcement at the event. *Id.* The Court overturned the ordinance because it lacked procedural safeguards to prevent viewpoint discrimination: the ordinance did not require officials to explain their decisions or to render a decision in any particular timeframe, and it provided no process for appealing an adverse decision. *Id.* The ordinance also lacked criteria to guide official discretion and prevent arbitrary decision making. *Id.* at 133-34.

In short, "[n]othing in the [Forsyth County] law or its application prevent[ed] the official from encouraging some views and discouraging others." *Id*.; *see Nationalist Movement v. City of New York*, 481 F.3d 178, 185-86 (3d Cir. 2007) (upholding non-discretionary permit application fee but striking down provision requiring applicants to provide security deposit for potential damage to city property with amount set based on content of planned speech); *see also Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002).

---

[16] The *Freedman* Court held that the censorship statute must include three procedural safeguards: (1) "[a]ny restraint imposed in advance of a final judicial determination on the merits must . . . be limited to preservation of the status quo," 380 U.S. at 59; (2) "the procedure must . . . assure a prompt final judicial decision," *id.*; and (3) the government must carry burden of proving that the expression at issue is unprotected, *id.* at 58.

This circuit has similarly relied on the *Forsyth County* procedural standards—explanation of decisions, timeframe restrictions, and appeals process—in reviewing challenged licensing schemes. *See Doctor John's*, 465 F.3d at 1162 (upholding a licensing scheme in part because it satisfied procedural safeguards outlined in *Forsyth County*).

Our careful review of Policy 5195 convinces us that the policy contains adequate procedural safeguards consistent with what *Forsyth County* requires. For example, the policy ensures prompt and transparent decision making, requiring officials to approve or deny a student's request within five school days and to provide written explanation of any denial. Students are entitled to appeal an unfavorable decision, first to Superintendent Gottlieb and then to the Board of Education, which must provide a hearing within 10 school days and provide a decision at its next regular meeting. These safeguards are designed to prevent viewpoint discrimination in the vast majority of circumstances.

In short, we find the policy contains adequate procedural safeguards to pass constitutional muster.

ii. Substantive Constraints on Discretion in the School Context

Neither the Supreme Court nor this court has specifically addressed the constitutionality of preapproval requirements in the school context. Our review of the District's policy is guided by general First Amendment case law, which requires substantive constraints to limit official discretion to "obviate the dangers of . . . censorship." *Freedman*, 380 U.S. at 58. But we must account for the Supreme Court's clear direction that students' "First Amendment rights [are] circumscribed 'in light of the

-35-

special characteristics of the school environment.'" *Morse*, 551 U.S. at 405 (quoting *Tinker*, 393 U.S. at 506).

Outside the school context, preapproval requirements that permit broad official discretion—for example, in the issuance of a parade or assembly permit—often run afoul of the First Amendment. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 433 (1963) ("Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."). But in the school context officials may use more discretion in addressing student speech. "If the schools are to perform their traditional function of 'inculcat[ing] the habits and manners of civility,' they must be allowed the space and discretion to deal with the nuances. The touchstone is reasonableness." *Muller ex rel. Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1543 (7th Cir. 1996) (citation omitted) (quoting *Fraser*, 478 U.S. at 681). "[S]chools may regulate some speech 'even though the government could not censor similar speech outside the school.'" *Morse*, 551 U.S. at 406 (quoting *Hazelwood*, 484 U.S. at 266).[17] We are constrained by the Court's instructions in this area.

---

[17] Even outside the First Amendment arena, the Court has emphasized that "special needs inhere in the public school context." *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 829 (2002) (quotations omitted) (addressing Fourth Amendment issue). Students' constitutional rights under the First, Fourth, and Fourteenth Amendments are therefore "different in public schools than elsewhere; the 'reasonableness' inquiry cannot disregard the schools' custodial and tutelary responsibility for children." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995).

Turning to Roswell District's Policy 5195, Section 2 constrains official discretion by providing a finite list of grounds on which officials may refuse approval for a student distribution. These "articulated standards" serve to prevent "censorship through uncontrolled discretion." *Forsyth Cnty.*, 505 U.S. at 133. As we explained above, the portion of section 2 that is relevant to Plaintiffs' facial challenge is subsection 2.a, which allows the school to disallow a student distribution if the distribution "[w]ould cause a substantial disruption or a material interference with the normal operation of the school or school activities." Aplt. Appx., Vol. I at 186. The policy language mirrors the *Tinker* standard. *See* 393 U.S. at 505-06. Our earlier analysis of Plaintiffs' as-applied First Amendment challenge employed the *Tinker* standard to review the District's decision to stop a distribution that was under way. Here, the language of subsection 2.a incorporates that standard to cabin official discretion and guide decision makers in determining whether a particular distribution should be allowed. *See Forsyth Cnty.*, 505 U.S. at 133.

Plaintiffs assert that subsection 2.a is subjective and argue that it therefore does not limit official discretion or prevent arbitrary decision making. But Plaintiffs' argument ignores that this part of the policy embodies the *Tinker* standard, which evaluates the exercise of school discretion based on objective reasonableness. *See Tinker*, 393 U.S. at 514. The inclusion of the *Tinker* standard in subsection 2.a instructs decision makers that distributions should not be prohibited unless they would substantially disrupt or materially interfere with school operations or activities. In other words, minor or immaterial disruptions do not justify withholding approval.

-37-

Moreover, we note that in *Tinker* itself, the action under review was a form of prior restraint. Two days before the students planned to wear the armbands to school to protest the war in Vietnam, the school principals "met and adopted a policy that any student wearing an armband to school would be asked to remove it, and if he refused would be suspended until he returned without the armband." 393 U.S. at 504. When the students arrived at school wearing the armbands, the school sent them home and suspended them "until they would come back without their armbands." *Id.* The school officials suppressed the students' speech for the most part before it occurred, which fits the general definition of prior restraint.

The Supreme Court in *Tinker* held that the school could not take such action in the absence of "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities." *Id*. at 514. The Court thereby articulated a standard that the school could use to restrict, in advance, student speech that could be reasonably forecast to cause substantial disruption. That is what the District's policy does here.

We therefore conclude, based on *Tinker* and its progeny, that the policy constrains official discretion sufficiently for the school context. We emphasize, however, that district officials must take care to apply the policy in a viewpoint-neutral manner to avoid its unconstitutional application. In particular, we note the District's procedural requirement that a school must provide a written statement of its reasons for denying permission for a particular distribution. In stating such reasons, officials must do more

than simply parrot the *Tinker*-based policy language. They must provide a fact-based explanation for why officials reasonably forecast that a particular distribution will cause a substantial disruption. *See Tinker*, 393 U.S. at 513 ("[T]he prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible."); *Nebraska Press*, 427 U.S. at 565 (reviewing a judicial injunction and discussing the importance of making clear, fact-based findings to support the need for prior restraint of speech).

### iii. *Other Circuits' Decisions on School Preapproval Policies*

The foregoing conclusion finds support in the decisions of other circuits that have considered school preapproval policies. Our review of these cases serves to place the present case in context and to demonstrate that our decision fits comfortably in the trend of decisions in this area. Nearly all circuits that have addressed this issue have concluded that the First Amendment permits school preapproval policies in some form. Although courts have not taken a uniform approach in analyzing particular policies, the clear trend is one of upholding policies that contain adequate procedural safeguards and place reasonable limits on official discretion.

We discuss our sibling circuit decisions in two groups, beginning with early decisions issued in the decade immediately after the Supreme Court's decision in *Tinker*, followed by a review of more recent cases.

Shortly after *Tinker*, the Second, Fourth, and Fifth Circuits concluded that schools

-39-

could require students to submit student-authored literature for approval before distributing it on a school campus. "[T]here is nothing *per se* unreasonable about requiring a high school student to submit written material to school authorities prior to distribution." *Sullivan v. Houston Indep. Sch. Dist.*, 475 F.2d 1071 (5th Cir. 1973). "[S]chool authorities may exercise reasonable prior restraint upon the exercise of students' first amendment rights," but any policy "must contain precise criteria sufficiently spelling out what is forbidden," and must provide for "[p]rompt approval or disapproval . . . [;] [s]pecification of the effect of failure to act promptly; and . . . [a]n adequate and prompt appeals procedure." *Nitzberg v. Parks*, 525 F.2d 378, 382 (4th Cir. 1975) (quotations omitted); *see also Eisner v. Stamford Bd. of Educ.*, 440 F.2d 803, 806-07 (2d Cir. 1971) (analyzing whether public school setting is an "exceptional case" under *Near v. Minnesota*, 283 U.S. 697 (1931), and concluding that a school preapproval policy was constitutionally permissible).

Although these courts concluded that school preapproval policies were constitutionally permissible as a general matter, they rejected specific policies that lacked procedural safeguards and/or failed to set substantive limits on official discretion. *See Nitzberg*, 525 F.2d at 383-84; *Baughman v. Freienmuth*, 478 F.2d 1345, 1351 (4th Cir. 1973); *Quarterman v. Byrd*, 453 F.2d 54, 60 (4th Cir. 1971); *Eisner*, 440 F.2d at 810; *see also Riseman v. Sch. Comm. of City of Quincy*, 439 F.2d 148, 149-50 (1st Cir. 1971) (rejecting preapproval policy that was vague, overbroad, and did not "reflect any effort to

minimize the adverse effect of prior restraint").[18]

These early cases' insistence that school preapproval policies be clearly defined and contain adequate procedural safeguards remains relevant to our analysis. As we have already discussed, the District policy at issue in the present case contains the necessary procedural safeguards lacking in the policies rejected in cases like *Eisner* and *Nitzberg*.

But other aspects of these early cases are time bound. They were decided without the benefit of the more recent Supreme Court guidance we rely on in this case. In particular, the Fourth Circuit in *Nitzberg* rejected a provision authorizing officials to ban any distribution that would "reasonably lead the principal to forecast substantial disruption of or material interference with school activities." 525 F.2d at 383. The *Nitzberg* court recognized that this language was drawn from *Tinker*, but nevertheless found it vague and overbroad as a preapproval standard. *Id.* Drawing on current Supreme Court law that was unavailable to the Fourth Circuit in 1975, we uphold language in the Roswell District policy that is similar to the *Tinker*-based language rejected by *Nitzberg*. Our conclusion differs from that in *Nitzberg* for two reasons.[19]

---

[18] The Fifth Circuit's decision in *Sullivan* is an example of a policy that met constitutional muster. The *Sullivan* court upheld a school preapproval policy after concluding that it contained reasonable and good faith protections. 475 F.2d at 1076. The policy established time frames for official review, specific provisions governing disciplinary procedures, and an appeals process. *Id.* at 1073-74. It allowed the school to withhold permission only in specific circumstances, for example, if the publication was libelous or obscene or advocated violation of laws or school rules. *Id.* at 1073.

[19] In addition to the reasons discussed here, we also note that the *Nitzberg* court failed to recognize that, as discussed previously, the school actions in *Tinker* were taken

Continued . . .

First, *Nitzberg* labeled the policy at issue as vague and overbroad without defining the legal standards it was applying to those terms or providing further analysis. *Id.*[20] In 1992, *Forsyth* provided a clear analytical framework for preapproval policies that is distinct from issues of vagueness. The relevant part of this analytical framework requires us to ask whether the policy provides sufficient guidance to decision makers to prevent "censorship through uncontrolled discretion." *Forsyth*, 505 U.S. at 123.

Second, and perhaps even more important, as we have already explained, the Supreme Court's post-*Tinker* school speech cases grant school officials more discretion in restricting student speech than would be permitted outside the school context. *See Morse*, 551 U.S. at 405-06; *Fraser*, 478 U.S. at 682; *see also Muller*, 98 F.3d at 1543. More recent circuit court decisions, including our decision today, have recognized this.[21]

We now turn to the second, more recent, group of circuit cases addressing school preapproval policies. In the past three decades, the school preapproval policies considered in circuit decisions have for the most part contained procedural safeguards and decision making criteria. As a result, circuits have generally upheld the challenged

_____

Cont.

pursuant to a school policy and the *Tinker* Court articulated the substantial disruption standard as a guide for officials in deciding whether to allow student speech to proceed.

[20] We address the issue of vagueness as applied to the Roswell District policy in the next section of this opinion.

[21] "In more recent years [since *Tinker*], however, the Court has been much less protective of speech in school environment and much more deferential to school authorities." Chemerinsky, *supra,* at 1194.

policies they considered.

The Eighth Circuit upheld a high school's preapproval policy in *Bystrom ex rel. Bystrom v. Fridley High School, Indep. Sch. Dist. No. 14*, 822 F.2d 747 (8th Cir. 1987), rejecting "the view that prior restraints are *per se* unconstitutional in the high-school context." *Id.* at 750. The *Bystrom* court specifically upheld a provision in the policy that was "intended to codify the rule of *Tinker*." *Id.* at 754. The provision allowed the school to restrict speech on the basis that it could "cause a material and substantial disruption to the proper and orderly operation and discipline of the school," so long as there were "specific facts upon which the likelihood of disruption [could] be forecasted." *Id.* at 754.

The Seventh Circuit upheld preapproval policies in two cases. In *Muller ex rel. Muller v. Jefferson Lighthouse School*, it upheld a preapproval policy at an elementary school, concluding the policy contained "adequate procedural safeguards." 98 F.3d at 1541.[22] In *Hedges v. Wauconda Community Unit School District No. 118*, 9 F.3d 1295 (7th Cir. 1993), the same court considered a junior high school preapproval policy that allowed school officials to restrict materials if they were deemed obscene or libelous, would invade the privacy of others, or would "cause substantial disruption of the proper and orderly operation of the school." *Id.* at 1296. The policy also banned outright any distribution of religious materials. *Id.* The court overturned the blanket restriction on

---

[22] The *Muller* court declined to apply *Tinker*, relying instead on *Hazelwood*, because the policy at issue was in an elementary school. The court reasoned that the "marketplace of ideas" theme reflected in *Tinker* was "less appropriate" in an elementary school of "five through thirteen-year-olds." *Id.* at 1538.

religious materials, but upheld the remainder of the policy and its preapproval

requirement. *Id.* at 1297-1303.[23]

Most recently, the Sixth Circuit upheld a policy strikingly similar to Policy 5195.

*M.A.L. ex rel. M.L. v. Kinsland*, 543 F.3d 841 (6th Cir. 2008). Like the Roswell District

policy, the *Kinsland* policy required students to submit materials to school officials in

advance and allowed the school to designate the time, place, and manner of distribution.

*Id.* at 845. The *Kinsland* policy contained procedural safeguards similar to the Roswell

policy. It designated strict time frames for official decision, required written explanation

for any denial, and guaranteed students at least two appeals. *Id.* at 844-45. Additionally,

like the Roswell District policy, the *Kinsland* policy allowed a school to deny approval if

the principal "reasonably determine[d]" that it "[w]ould cause a substantial disruption of

or a material interference with the normal operation of the school or school activities."

---

[23] *Muller* and *Hedges* implicitly reversed the Seventh Circuit's previous position in *Fujishima v. Board of Education*, 460 F.2d 1355 (7th Cir. 1972), which rejected school preapproval policies as an unconstitutional prior restraint. *Id.* at 1557-59. Neither *Muller* nor *Hedges* mentioned *Fujishima*, but other cases and courts have noted the shift. *E.g.*, *Wernsing v. Thompson*, 423 F.3d 732, 748 (7th Cir. 2005) (acknowledging inconsistency between *Muller* and *Fujishima*); *Harless v. Darr*, 937 F. Supp. 1339, 1344-45 (S.D. Ind. 1996) (questioning the continued validity of *Fujishima* given subsequent Supreme Court and Seventh Circuit case law); *Hedges ex rel. Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 807 F. Supp. 444, 457 n.14 (N.D. Ill. 1992) (noting that the Seventh Circuit has departed from *Fujishima*'s analytical framework), *rev'd on other grounds by Hedges*, 9 F.3d at 1303; *see also Pounds v. Katy Indep. Sch. Dist.*, 517 F. Supp. 2d 901, 918 (S.D. Texas 2007) (noting that the Seventh Circuit allows prior-review requirements in schools under *Muller* without mention of *Fujishima*).

*Id.* at 845.[24]

We are aware of only one circuit opinion in the past three decades to reject a school preapproval policy. In *Burch v. Barker*, 861 F.2d 1149 (9th Cir. 1988), high school students distributed copies of a non-school-sponsored student newspaper at a school-sponsored barbecue on school grounds. *Id.* at 1150. They were reprimanded for not seeking preapproval for the distribution, as required by school policy. *Id.* at 1150-51. Although the newspaper was "generally critical of school administration policies," the principal did not find any content objectionable or any problem with the manner of the distribution. *Id.* at 1150-51.

Among other things, the policy allowed the school to ban materials based on evidence that would reasonably support "a judgment that significant or substantial disruption of the normal operation of the school" could result. *Id.* at 1151. The policy provided certain types of expression could be considered evidence of potential disruption, including material criticizing school officials. *Id.* The school "admitted that if the students had submitted [the newspaper] for prior review, [the school] would have allowed distribution without change." *Id.* Finding itself "confronted with a unique and ironic situation in which a school . . . punished students for distribution of material which both

---

[24] Our analysis differs from that in *Kinsland* because the Sixth Circuit applied *Hazelwood*, rather than the more speech-protective *Tinker* standard. *Id*. at 847, 849. As we explain in our discussion of the Plaintiffs' as-applied free speech claim, the Supreme Court recently clarified that *Tinker* governs claims involving private (non-school-sponsored) student speech. *See Morse*, 551 U.S. at 405-06.

sides acknowledge could not be suppressed under the first amendment," the Ninth Circuit reversed the district court's decision to dismiss the students' First Amendment claim. *Id.* at 1151-52. The opinion states that the policy was based on "undifferentiated fears," *id.* at 1159, and concludes that "a policy which subjects all non-school sponsored communications to predistribution review . . . violates the first amendment," *id.* at 1157.[25]

We agree that the student speech in *Burch* was entitled to First Amendment protection and that portions of the policy were probably unconstitutional on their face, such as the provision making criticism of school officials a ground on which to deny permission for distribution. But *Burch*'s broad statement suggesting that no preapproval policy could pass constitutional muster runs counter to every school speech case we have cited in this opinion. It is even difficult to square with the Supreme Court's rulings concerning licensing schemes outside the school context. Moreover, *Burch*'s persuasive force is diminished after 25 years of Supreme Court and various circuit court school speech decisions upholding school officials' discretion to maintain a nondisruptive school environment. For these reasons, we do not find *Burch* persuasive and do not follow it here.

---

[25] Parts of the *Burch* opinion read like an analysis of an as-applied challenge to the policy, for example, by stating, "[t]here was no evidence that [the newspaper] had interfered with the operation of the high school or impinged upon other students' rights." 861 F.2d at 1151. Yet the court's conclusion seems to address a facial challenge: "There is . . . no justification for this policy, which conditions all distribution of student writings on school premises upon prior school approval." *Id*. at 1159.

In sum, our reading of Supreme Court case law leads us to conclude, along with a majority of our sibling circuits, that a school may enact a preapproval policy subject to the constitutional requirements we have described. The District's policy meets these requirements.

\*     \*     \*

For these reasons, we affirm the magistrate judge's holding that the preapproval policy is not facially unconstitutional as a prior restraint.

### 3. *Policy 5195 is Not Unconstitutionally Vague*

The magistrate judge rejected Plaintiffs' argument that the District's preapproval requirement is unconstitutionally vague. We agree.

A policy may be "impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Jordan*, 425 F.3d at 824-25. Plaintiffs argue that the policy "leave[s] students and administrators to guess at what speech is subject to approval." Aplt. Br. at 31. They rely primarily on Supreme Court authority requiring narrow specificity in criminal statutes that affect First Amendment expression. *E.g., Grayned v. City of Rockford*, 408 U.S. 104 (1972); *Button*, 371 U.S. at 432.

But Plaintiffs' cited cases do not concern non-criminal policies in the unique context of public schools. *See Village of Hoffman Estates*, 455 U.S. at 498-99 ("The Court has . . . expressed greater tolerance of enactments with civil rather than criminal

-47-

penalties because the consequences of imprecision are qualitatively less severe."); *see also Morse*, 551 U.S. at 396-97 ("Constitutional rights of students in public school are not automatically coextensive with rights of adults in other settings, and . . . the rights of students must be applied in light of the special characteristics of the school environment." (quotations and citations omitted)).

Our review of the policy convinces us that a reasonable high school student of ordinary intelligence would understand when preapproval is needed and how to go about requesting it. *See West*, 206 F.3d at 1368; *see also Grayned*, 408 U.S. at 108 (a law must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"). Policy 5195 clearly requires students to obtain approval before distributing 10 or more non-school-sponsored items on campus. It offers extensive definitions of "distribution" and "non school sponsored literature." The latter includes written, printed, visual, or auditory materials that are not related to school curricula. [*Id*.] The policy spells out the steps required for submitting a request.

Plaintiffs also argue that the policy is subject to "wildly divergent interpretations" and thus invites arbitrary or discriminatory enforcement. Aplt. Br. at 37; *see Jordan*, 425 F.3d at 824-25. They offer no evidence of inconsistent application. Instead, they point to deposition testimony in which different school officials offered varying opinions as to how the policy would apply to hypothetical scenarios. But occasional differences in

theoretical interpretation will not render a policy facially unconstitutional. *See Hoffman Estates*, 455 U.S. at 497-98.[26]

We therefore affirm the magistrate judge's holding that the policy is not unconstitutionally vague.

### 4. *Concluding Statements on Plaintiffs' Facial Challenge*

Having concluded that the District's preapproval requirement is not facially unconstitutional as a prior restraint or for reasons of vagueness or overbreadth, we affirm the magistrate judge's summary judgment order dismissing Plaintiffs' facial challenge. We emphasize our holding extends only to Policy 5195's preapproval requirement and associated procedural safeguards, and to the substantive restriction in subsection 2.a. We make no determination regarding the constitutionality of other District policies or provisions that do not apply to the speech in which Plaintiffs wish to engage.

We close the facial challenge discussion with a cautionary note. Although public school officials enjoy more discretion regarding speech regulation relative to officials in other contexts, this discretion is limited. District officials are "not at liberty to suppress or punish speech simply because they disagree with it, or because it takes a political or social viewpoint different from . . . that subscribed to by the majority." *Bystrom*, 822 F.2d at 755. Nor is it constitutional to prevent private student speech solely out of concern that some listeners may be offended by a controversial message. *See Tinker*, 393

---

[26] Moreover, these examples mostly involved hypothetical questions about the unwritten standard practice, now subsumed by the more detailed written Policy 5195.

U.S. at 510. We hold only that this policy is not unconstitutional on its face. "This does not mean that every application . . . will be valid." *Bystrom* 822, F.2d at 755. The Constitution, and not the policies alone, governs any restriction of student speech.

D. *Plaintiffs' Free Exercise Claim*

"Like other provisions of the First Amendment," the Free Exercise Clause is "applied to the states under the Fourteenth Amendment." *Green v. Haskell Cnty. Bd. of Comm'rs*, 568 F.3d 784, 796 (10th Cir. 2009); *see also Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940). The magistrate judge granted summary judgment for the District on Plaintiffs' free exercise claim. It found that the District's actions were based upon neutral rules of general applicability and were rationally related to the District's "reasonable and legitimate pedagogical concerns," including, among other things, "maintaining school security and order" and "preserving a proper educational environment and preventing its disruption." Aplt. Appx., Vol. IV at 1040.

"Depending on the nature of the challenged . . . government action, a free exercise claim can prompt either strict scrutiny or rational basis review." *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1294 (10th Cir. 2004) (quotation omitted). Government actions that stem from "neutral" rules of "general applicability" are subject to rational basis review, even if the application of the neutral rule "has the incidental effect of burdening a particular religious practice." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993); *see also Employment Division v. Smith*, 494 U.S. 872, 878-881 (1990); *Corder*, 566 F.3d at 1232. A rule is neutral "so long as its object is something other than the

-50-

infringement or restriction of religious practices." *Corder*, 566 F.3d at 1233. Under rational basis review, the action survives a constitutional challenge if it is at least "rationally related to a legitimate government interest." *Id.* at 1232.

On the other hand, when a government policy facially targets religion or is established for the *purpose* of targeting religion, application of that policy is subject to strict scrutiny. *Corder*, 566 F.3d at 1232-1233. Under strict scrutiny, the government must prove its policy or application of that policy is narrowly tailored to accomplish a government interest that is compelling, not merely legitimate. *City of Hialeah*, 508 U.S. at 546.

Plaintiffs acknowledge that the District's policy regarding student distributions is facially neutral. They nevertheless argue that strict scrutiny should apply because they allege the District stopped the distribution with the purpose of suppressing their religious message. *E.g.*, *City of Hialeah*, 508 U.S. at 533-34. They ask us to infer this from the fact that school officials permitted non-Relentless students to distribute Valentine's Day cards, birthday party invitations, candy, and the like, while denying permission for their rubber fetus distribution.

For Plaintiffs' argument to be persuasive, the other distributions must be similar enough in all material respects to support a conclusion that the District's decision to stop the distribution was based on its religious nature. Otherwise, any burden to Plaintiffs' religious exercise is "an incidental effect" of applying a neutral rule—and is thus subject to rational basis review. *City of Hialeah*, 508 U.S. at 531; *Corder*, 566 F.3d at 1232.

-51-

Unfortunately for Plaintiffs' argument, none of the non-religious distributions were materially similar to the rubber fetus distribution, quantitatively or qualitatively. There is no evidence anyone else attempted to distribute hundreds or thousands of items. There is also no evidence that any of the permitted non-religious distributions caused, or presented a potential for, substantial disruption.

Plaintiffs also argue that Mr. Luck's statement, "It's time to shut this down. . . . Some people are getting offended," Aplt. Appx., Vol. IV at 996, shows that the District acted with the purpose of suppressing their religious exercise. As we explain in our discussion of Plaintiffs' as-applied free speech claim, we are not convinced that Mr. Luck's statement indicates that he or anyone else was offended by the religious nature of the Plaintiff's expression.

But even if we accept Plaintiffs' inference with respect to this single statement, the record viewed as a whole still does not support an inference that the District restricted Plaintiffs' speech because of its religious content. *See Fleming*, 298 F.3d at 931 ("We are obligated to examine the record as a whole . . . as opposed to carving out an isolated statement from the record."). The record indicates that Mr. Luck's involvement in preventing the rubber fetus distribution was limited to this one early interaction. Senior administrators at both schools and several district officials, including Superintendent Gottlieb, made the ultimate decision to disallow the distribution. The evidence indicates these decision makers were acting with permissible motives, especially in light of the multiple disruptions to the educational program.

-52-

Plaintiffs also do not explain how their allegation that the District acted with the purpose of suppressing their religious exercise squares with how the District routinely accommodated their religious expression in other forms that were not disruptive—for example, their many other religious distributions and their silent and spoken prayers on school grounds. We cannot reasonably infer from the record that the District acted with the purpose of suppressing religious practice.

We therefore determine the District's actions were based upon neutral rules of general applicability, subject to rational basis review. *Corder*, 566 F.3d at 1232 ("Neutral rules of general applicability normally do not raise free exercise concerns even if they incidentally burden a particular religious practice or belief.") (quoting *Smith*, 494 U.S. at 879). Applying rational basis, we conclude that the District's interests justified the incidental effect of burdening Plaintiffs' religious exercise.

The only reasonable inference from the record is that the District disallowed the rubber fetus dolls for the neutral reason that they were disruptive, and that it allowed the other distributions and expressions for the neutral reason that they were not disruptive. Efforts to avoid disruption are rationally related to the school's interests in maintaining discipline and protecting the educational environment. Case law makes clear these interests are a good deal more than merely rational. *Rasmussen*, 298 F.3d at 1205; *see also Morse*, 551 U.S. at 406-07; *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 655-56 (1995).

We therefore conclude that the District's decisions to stop the fetus doll distributions survive rational basis review. We affirm the magistrate judge's dismissal of the free exercise claim.

E. *The Equal Protection Claim*

The magistrate judge dismissed Plaintiffs' equal protection claim, concluding they had failed to show they were similarly situated to others treated differently. We agree.

The Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.A. To prevail on an equal protection claim, a plaintiff must show that she was treated differently from others who were similarly situated. *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998) ("[I]n order to prevail on his equal protection claim, [the plaintiff] must show that the University treated him differently than others 'similarly situated'. . ."); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985); *Landmark Land Co. v. Buchanan*, 874 F.2d 717, 722 (10th Cir. 1989). "The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons *who are in all relevant respects alike*." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (emphasis added).

Plaintiffs argue that they were treated differently because non-Relentless students were permitted to distribute Valentine's Day cards, chocolate, and stuffed animals on the same day that they were prevented from distributing the rubber fetuses. But different treatment is problematic only if Plaintiffs were similarly situated to the non-Relentless

-54-

students whose distributions were allowed. As our analysis of Plaintiffs' free exercise claim shows, they were not similarly situated. The Valentine's Day cards and other items were different in kind and scale from the rubber doll distribution. No other students attempted to distribute hundreds or thousands of items, and there is no evidence any other distribution caused substantial disruptions.

Furthermore, the distributions most similar to the rubber fetus distribution in kind and scale were other religiously themed distributions conducted by Plaintiffs and other Relentless members themselves, such as the hot chocolate, affirmation rocks, wristbands, dog tags, pencils, and Easter eggs—which the District allowed. We cannot reasonably infer from these facts that Plaintiffs were singled out for different treatment.

Because Plaintiffs cannot demonstrate that they were similarly situated to others who were treated differently, the equal protection claim must fail. We therefore affirm the magistrate judge's grant of summary judgment to the District on Plaintiffs' equal protection claim.

## III. CONCLUSION

For the foregoing reasons, we affirm the magistrate judge's grant of summary judgment to the District on all claims.